**OAK BROOK HOTEL COMPANY, an Illinois limited partnership, and Donald W. West, Individually, Plaintiffs and Counterclaim Defendants,**

v.

**TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, Defendant and Counterclaim Plaintiff.**

No. 91 C 6208.

United States District Court,
N.D. Illinois, E.D.

Feb. 14, 1994.

Howard T. Brinton, Brian C. Rocca, Brinton & Fedota, Chicago, IL, for plaintiffs.

Paula J. Morency, Susan J. Irion, Mayer, Brown & Platt, Chicago, IL, Marc P. Cherno, John C. Sullivan, Natalie K. Chetlin, Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendant.

*MEMORANDUM OPINION AND ORDER*

ASPEN, District Judge:

This action arises out of an aborted loan agreement between plaintiffs Oak Brook Hotel Company ("OBHC") and Donald W. West ("West") and defendant Teachers Insurance and Annuity Association of American ("Teachers"). Currently before us are defendant's motions for summary judgment on liability and damages. For the following reasons, we deny the motion for summary judgment on liability and grant in part and deny in part the motion for summary judgment on damages.

## I. Factual Background

Plaintiff West is the general partner of OBHC, which was the sole beneficiary of a Trust that owned the Hyatt Regency Oak Brook Hotel. Sometime in 1986, OBHC began negotiating with Teachers to obtain a $42 million loan. The loan, secured by the hotel and property, was largely going to be used to repay a $30 million construction loan by Heller that was due on December 31, 1986.[1]

### A. The Commitment Letter

On June 5, 1986, the parties signed a Commitment Letter outlining the terms and conditions of the loan.[2] In addition to requiring OBHC to finalize a management contract with Hyatt Hotels Corporation "in form satisfactory to [Teachers]," [3] Teachers stated that "[a]ll obligations on [its] part herein [were] expressly subject to ... [its] approval of a current appraisal of the Subject Property prepared by an appraiser designated by us." Plaintiff's Exh. E at ¶ 10(a). The loan was to become effective upon acceptance of the agreement as delineated in the Letter and upon payment by OBHC of $840,000 and delivery of a $420,000 letter of credit payable to Teachers.

Under the Letter, both of these sums were to be returned once OBHC complied with all

---

1. The construction loan had been made to finance various expansion and improvement efforts.

2. By its own terms, New York law governs the Commitment Letter. *See* Plaintiff's Exh. E at ¶ 8.

3. As it stood on September 19, 1986, Hyatt, who had already been managing the hotel, agreed to extend its contract. Under the existing contract, Hyatt earned incentive payments as part of its compensation package.

covenants and conditions set forth in the Commitment Letter and upon the closing of the transactions and/or the first disbursement thereunder. However, if OBHC failed to satisfy any of the various conditions, with one notable exception, before September 30, 1986, Teachers was entitled to keep the $840,000. The exception read as follows:

> In the event of [Teachers'] disapproval of the appraisal, or the engineering report for items that cannot be reasonably corrected by [OBHC], required herein, or of [Teachers'] incapacity to comply with any applicable law or governmental regulation, then in such event [Teachers'] sole liability shall be to return to [OBHC] the said Letter of Credit and to refund the sum of $840,000 paid hereunder and thereupon this agreement shall become null and void.

Plaintiff's Exh. E at ¶ 12.

### B. The Appraisal and Management Contract

Once the Commitment Letter had been signed, Teachers hired Landauer Associates, Inc. ("Landauer") to value the hotel property. After investigating the property, Landauer submitted three letters to Teachers recounting their findings. The first, dated September 15, 1986, cited a market value of $46 million and expressly assumed that the incentive fee arrangement between OBHC and its Hyatt management would be fully subordinated.[4] In its second letter, dated September 17, 1986, Landauer instead assumed full fee accounting between OBHC and Hyatt—i.e. no' subordination—and appraised the property at $43.5 million. Finally, in what appears to be its final missive, Landauer sent Teachers a September 19, 1986 letter placing the value of the property at $46 million "expressly subject to [Teachers'] proposed financing and further assum[ing] per your instructions, full subordination of the incentive fee portion of the management contract between the owner [OBHC] and Hyatt Hotel Corporation." Plaintiff's Exh. Q.

Prior to September 19, 1986, OBHC and Hyatt had had no conversations regarding any subordination of these incentives. The parties agree, however, that Teachers had sent OBHC a draft "Recognition, Estoppel, Attornment and Non–Disturbance Agreement" on August 19, 1986 which included a provision subordinating Hyatt's incentive fees to Teachers' mortgage payments. Plaintiff's Exh. M at ¶ 5(c). Upon noticing the subordination language, West phoned John Miner, Teachers' counsel, to register his displeasure with the provision and his understanding that the parties had not previously agreed to such a term. It is not clear whether the parties reached an agreement regarding subordination at that time, nor can we discern what steps they took to resolve the apparent controversy.

Nevertheless, on September 29, 1986, Teachers sent West a letter stating that "[t]he appraisal of the above property by Landauer and Associates, Inc., dated September 19, 1986 has been approved." Plaintiff's Exh. F. Although the appraisal cited the subordination assumption, the letter itself made no reference to subordination.

The next day (the day the loan was to close), the Teachers' officer in charge of the OBHC loan, Mary Beth Sandiford ("Sandiford") telephoned West and informed him that the approved appraisal had expressly assumed subordination of Hyatt's incentive fee, and that without subordination, the appraisal would not support the loan.[5] Deciding to extend the loan deadline in the hopes of finalizing the transaction, the parties engaged in a struggle to characterize the nature of OBHC's "non-compliance." OBHC sought to treat its inability to force Hyatt to renegotiate its management contract to include subordination as an appraisal problem, thereby guaranteeing that if the loan foundered, OBHC would get its money back. On the other hand, Teachers chose to view the lack of a subordination agreement as a management contract problem—a perspective

---

4. All of Landauer's appraisals assumed the proposed financing by Teachers.

5. Defendants dispute this characterization of the phone conversation, contending that Sandiford placed her concerns about subordination squarely within the context of the management contract rather than the appraisal.

that would allow it to retain the $840,000 under the contract.

### C. Heller's Foreclosure

Ultimately the loan failed and Teachers kept the $840,000, although it did not draw upon the letter of credit.[6] On December 31, 1986, OBHC's construction loan with Heller came due. Receiving no payment, Heller foreclosed on its loan.[7]

After some initial pre-trial discovery and motions, Heller, OBHC, West, and various creditors of OBHC and West reached a settlement (the "Workout") and dismissed the foreclosure action with prejudice. Under the Workout, Heller extended the maturity date of the $30 million construction loan and increased the amount of its loan to $40 million. This restructured loan was used, in part, to defray the foreclosure costs and was memorialized in two new promissory notes executed by LaSalle National Bank (the "Notes").[8]

The Workout called for OBHC to transfer its beneficial interest in the Trust assets to the Spring Road Hotel Limited Partnership ("Spring Road"). In turn, a wholly-owned subsidiary of Heller became the general partner of Spring Road and held a 1% equity interest in the partnership. OBHC became Spring Road's sole limited partner, holding the remaining 99% of equity.

In the event that the restructured loan was not fully paid off by June 30, 1990, Spring Road's Partnership Agreement established that the general partner's equity interest would increase each month while OBHC's interest would correspondingly decrease until either the loan was fully discharged or OBHC depleted its equity interest in Spring Road. In any event, if the loan was not fully repaid by June 30, 1992, OBHC's interest would expire. Ultimately, Spring Road did not sell the Hotel before June 30, 1992, nor

did it generate enough funds to discharge the restructured loan. Accordingly, OBHC no longer holds an equity interest in the property.

Concurrent with, and as a condition precedent to, the Workout, OBHC, Heller, and LaSalle executed an Assignment of Teachers' Recovery. Although it did not require OBHC and/or West to seek recovery from Teachers in connection with the failed Commitment Letter, the Assignment was structured to ensure that the proceeds of any recovery would be first applied to paying down the restructured loan, while generally allowing OBHC to retain some portion (up to 50%) of the proceeds.[9]

In 1991, OBHC filed suit against Teachers. In its amended complaint, OBHC claims that Teachers breached the loan contract (Counts I and II) and that the company's conduct violated the Illinois Consumer Fraud and Deceptive Practices Act (Count III). As a result, OBHC seeks $51 million in damages, broken down as follows:

1. Good Faith Deposit of $840,000
2. Interest on Good Faith Deposit of roughly $900,000
3. Expenses of foreclosure action— $2,706,488
4. Interest rate differential of approximately $3,800,000
5. Lost Profits of approximately $24,500,-000
6. Lost Equity—$11,000,000 [10]

## II. Discussion

Teachers contend that no reasonable jury could find for plaintiffs on any of their claims. Accordingly, the company has moved for summary judgment on liability and, in the alternative, for summary judg-

---

6. Heller had provided both the letter of credit and the $840,000.

7. The parties disagree about whether Teachers' failure to return the $840,000 for payment to Heller caused Heller to foreclose on the $30 million construction loan.

8. As described earlier, West was the general partner of OBHC—a limited partnership that was the sole beneficiary of a Trust Agreement

under which LaSalle National Bank was the Trustee. LaSalle executed the new notes in its capacity as Trustee.

9. The terms are somewhat more complicated than this. See Plaintiff's Exh. GG.

10. As best we can determine, this $11 million figure represents OBHC's original investment in the hotel.

ment on damages. We address these motions in turn.

### A. Summary Judgment on Liability

At bottom, Teachers' contention that it deserves summary judgment on the liability issue stems from its claim that OBHC failed to satisfy a condition precedent to the loan—namely, the requirement that there be a satisfactory appraisal of the property.[11] In opposition, OBHC charges that Teachers is estopped from challenging the appraisal condition.

■ By the terms of the Commitment Letter, Teachers was not to unreasonably withhold any required approval, satisfaction, or consent. Plaintiff's Exh. E at ¶ 9. Because the appraised value of the property, even without an assumption of subordination, exceeded $42 million (the value of the loan), OBHC asserts that Teachers' rejection of the appraisal was unreasonable. Teachers' unreasonable withholding of approval has two implication. First, if Teachers did unreasonably reject the appraisal, it necessarily breached the agreement. Such a breach arguably precludes Teachers from relying on the appraisal condition precedent in justifying its decision not to fund the loan. Perhaps more significantly, if Teachers' disapproval of the appraisal was unreasonable, then, by extension, the appraisal should have been approved and OBHC in fact met this condition precedent.

By way of demonstrating that its rejection of the appraisal was reasonable, Teachers points out that it is statutorily required to make only "prudent" loans, that the industry standard for an acceptable loan to value ratio is 75–80%, see Plaintiffs' Exh. CC at 63, and that it therefore behaved prudently in refusing to go forward on the $42 million loan without a subordination agreement. Most of the underlying facts relevant to this particular issue are undisputed. The parties agree that the appraisal value assuming subordination was $46 million (a 91% loan to value ratio) and that without subordination it was $43.5 million (a 96.5% loan to value ratio). It is likewise clear that Teachers was prepared to lend the money if OBHC was able to negotiate a subordination agreement with Hyatt. The question presented, then, is whether it was "unreasonable" for Teachers to withhold approval for the sake of a $2.5 million value differential.

Typically, questions of reasonableness should go to the trier of fact. In addition, we observe that neither the $46 million nor the $43.5 million appraisal value even came close to satisfying the industry standard of a 75–80% loan to value ratio. As such, material questions of fact remain in connection with Teachers' decision to disapprove the appraisal without a subordination agreement and preclude an award of summary judgment on liability.[12]

### B. Summary Judgment on Damages

In the alternative, Teachers has moved for summary judgment on damages, challenging OBHC's damage claims on two grounds. First, the lender contends that OBHC seeks reimbursement for numerous expenses that were actually shouldered by Heller. Additionally, Teachers maintains that many of OBHC's alleged consequential damages are speculative and are not cognizable as a matter of law.

#### 1. Expenses Paid by Third Party

■ Teachers asserts that roughly $8 million of the damages sought by OBHC in this

---

**11.** Although Teachers maintains that OBHC failed to satisfy both the appraisal and the management contract conditions of the Commitment Letter, it apparently concedes that material issues of fact remain regarding the management contract condition. Specifically, in its supporting brief, Teachers proposes that if the Court grants its motion, it will repay the commitment fee, plus interest, "rather than try the issue of its right to retain the commitment fee based on OBHC's failure to satisfy the management condition ... in the Commitment Letter." Brief in Support at p. 8.

**12.** Having determined that a jury issue remains regarding the reasonableness of Teachers' rejection of the appraisal and that, by extension, questions of fact persist regarding OBHC's satisfaction of this condition precedent, we need not address OBHC's contention that (1) the appraisal was actually approved, (2) that Teachers waived the appraisal condition precedent by failing to return the $840,000, and (3) that Teachers is estopped from raising any condition precedents due to its own breach of the Commitment Letter in requiring a subordination agreement at the last minute and without prior negotiation.

action constitute fees and expenses paid by Heller, not OBHC. Specifically, the damages Teachers challenges on this ground are as follows: the $840,000 commitment fee, the interest charged by Heller in excess of that provided for in the proposed Teachers' loan, and expenses related to the Heller foreclosure action and ensuing Workout. Although Teachers acknowledges that it is potentially contractually liable for the $840,000 commitment fee, it points out that the remaining expenses, interest, and fees were paid for by Heller and added to the balance of the restructured loan—a loan which only LaSalle signed and for which neither OBHC nor West executed a personal guaranty.

Teachers does not disagree that higher workout interest rates and the expenses associated with foreclosure ordinarily constitute damages stemming from a breached agreement to provide a take-out loan. Instead, Teachers simply argues that OBHC and West have no obligation to repay these amounts, and therefore cannot recover them here. *Coyne v. Campbell,* 11 N.Y.2d 372, 183 N.E.2d 891, 230 N.Y.S.2d 1 (N.Y.Ct.App. 1962) (plaintiff may not recover from defendant the value of services rendered to plaintiff by a third party where plaintiff had no obligation to, and in fact did not, pay for the services).

At first glance, Teachers' argument has some appeal. The parties agree that Heller paid many of the costs at issue and then added them onto the restructured loan balance.[13] Moreover, neither OBHC nor West's names appear on the promissory notes executed in conjunction with the Workout and restructured loan. Apparently, then, OBHC and West are off the hook for the defaulted and restructured loan.

However, a closer examination of the Workout and restructured loan reveals that in fact plaintiffs may well have been damaged by the foreclosure and its attendant costs. Specifically, Spring Road's Partnership Agreement provides that if the Heller loan was not repaid in full by June 30, 1990, the limited partner's equity interest (i.e.,

OBHC's interest) would transfer on a monthly basis to the general partner (a wholly-owned subsidiary of Heller). Similarly, OBHC and West executed an agreement with Heller in which they assigned to Heller significant portions of their rights to any recovery from Teachers—the assignment being structured so that settlement proceeds would be applied first to unpaid loan balances, and then be divided between OBHC and Heller. None of these steps would have been necessary had OBHC been able to take out Heller's loan on December 31, 1986 as planned. Finally, it is worth remarking that OBHC was the sole beneficiary of the Trust on whose behalf LaSalle executed the 1987 promissory note.

Taken together, the various agreements and transactions entered into by Heller, OBHC, West, and LaSalle leave open the question of whether and to what degree plaintiffs in this case were damaged by the foreclosure action and by the terms of the restructured loan. Consequently, whether plaintiffs are entitled to recover the costs, interest, and expenses added to the loan balance also remains a disputed issue. We will therefore not grant summary judgment on these portions of OBHC's damage claims.

### 2. Lost Profits

New York law directs that, in order to recover lost future profits, a plaintiff must demonstrate with certainty that such damage has occurred and is traceable to the breach. Furthermore, the scope of the alleged loss must be capable of proof with reasonable certainty. *See Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261, 493 N.E.2d 234, 235, 502 N.Y.S.2d 131, 132 (Ct.App.N.Y. 1986). In moving for summary judgment on OBHC's claims for lost profits and equity, Teachers makes it clear that its "motion does not concern the quantum of damages claimed to have been suffered," but asserts that "plaintiffs have failed to discharge their obligation under New York Law of establishing with the required certainty that they have *in fact* been damaged." Reply Brief at 1 (emphasis in the original). Contending that

---

**13.** Teachers concedes, for the purposes of this motion only, that OBHC directly paid for $130,-824 of the foreclosure-related expenses, and thus does not seek summary judgment on this amount.

plaintiffs can only establish damage by means of impermissible speculation, Teachers requests summary judgment.

There is no dispute that from 1988 through 1992, the hotel did not generate enough income to cover the interest payments contemplated by the Commitment Letter. However, OBHC offers expert testimony that had West remained in charge of the hotel, it would have had higher earnings than it did. On its face, this evidence creates a triable issue of fact regarding (1) the existence of lost profits by plaintiffs, and (2) the amount of lost profits.

Plaintiffs' expert, Gerald T. Eisenstein ("Eisenstein") developed two different projections of OBHC's lost profits. In Assumption 1, the so-called worst case scenario, Eisenstein relied on actual 1987 performance figures to determine how the hotel would have done had West remained in charge.[14] In this scenario, the hotel would have lost money each year, but it would have lost less than it actually did without West's involvement. In Assumption 2, Eisenstein relied on the hotel's projected performance as calculated by West and Hyatt prior to the Teachers' loan.[15] These projections show the hotel making money through 1992.

Teachers argues that because plaintiffs' worst case scenario (Assumption 1) shows the hotel losing money every year, they cannot demonstrate with any certainty that they have been damaged. There are several flaws in this reasoning. First, the relevant fact of Assumption 1 for our purposes is that, absent Teachers' breach, the hotel would have lost *less* money that it actually did. This differential represents damage to plaintiffs attributable, according to the expert, to the loss of West as a managing partner.[16]

Second, and perhaps more importantly, Teachers offers no evidence that a trier of fact would favor Assumption 1 over Assumption 2. Accordingly, even if plaintiffs were barred from recovery under Assumption 1, a reasonable jury could find Assumption 2 more persuasive than Assumption 1.[17]

The fact that the losses projected in Assumption 1 would have placed OBHC in default under the Teachers' loan is similarly not dispositive for two reasons. First, as already mentioned, there is no evidence that the trier of fact will prefer Assumption 1 over Assumption 2. Moreover, the fact that a borrower is in default is not dispositive evidence that a lender will foreclose on a loan. Indeed, as this case amply demonstrates, there are many reasons why a lender may choose not to foreclose, but to work with a troubled borrower. Accordingly, while Teachers is free to challenge the losses tallied by Eisenstein with its own arguments and evidence,— including evidence that the loan would have been foreclosed—it is not entitled to summary judgment on these grounds.

■ As for Teachers' arguments (1) that West was unfamiliar with the management decisions of Hyatt and Heller between 1988 and 1992, and (2) that Assumption 2's reliance on the new teleconferencing capacity renders the projections too speculative as a matter of law, these, too, must fail. As a threshold matter, we observe that Teachers did not raise these arguments in its initial brief, thus precluding plaintiffs from responding. Because these arguments were made for the first time in reply, we need not address them. We note in passing, however, that Teachers contentions are not especially compelling. West's familiarity or lack thereof with Hyatt and Heller's management from 1988 through 1992 is not dispositive, since

---

14. In both projections, Eisenstein assumed the interest expenses that would have been in place under the Teachers' loan.

15. Eisenstein expressly notes that in making these projections, West and Hyatt assumed that the hotel would fully utilize its new teleconferencing ability and that it would not be under the cloud and pressure of a foreclosure action. *See* Exh. EE, tab 11 at 1. In his affidavit, Eisenstein states that he believes West and Hyatt's projections are more reliable.

16. Teachers does not dispute that West's removal from control was at Heller's behest, and that Heller was in a position to make such a decision as a result of its foreclosure.

17. To be sure, the fact that Teachers was willing to loan OBHC $42 million on the strength of its past performance and projected achievement lends suggests that Assumption 2 may be more on target than Assumption 1.

there is no evidence that Eisenstein did not have access to other relevant bases for comparison. Nor does Teachers explain why the lack of such a comparison should go to the legitimacy of the projections, rather than to their weight. As for the reliance on the new teleconferencing capabilities, Teachers offers no evidence regarding the extent to which the new feature affected the projections at issue, nor is it beyond question that the hotel's former conference business provides a sufficient historical basis for the projections. In sum, these untimely contentions do not justify an award of summary judgment.

### 3. Lost Equity [18]

 Teachers' request for summary judgment on OBHC's loss of equity claim rests primarily on its contention that in one of his two projections (Assumption 1), Eisenstein concludes that the present value of the subject property was less than the amount of Teachers' proposed loan. As we have already discussed, however, plaintiffs have offered another projection which demonstrates a positive value for the property, and their expert has endorsed that projection. Because a reasonable jury could accept this projection, it would be inappropriate to grant summary judgment on the strength of Assumption 1.

Similarly, the 1987, 1990, and 1991 appraisals do no more than confirm the existence of a material dispute regarding the equity value of the property over time. While Teachers has evidence suggesting that there was no equity in the property for plaintiffs to lose, plaintiffs likewise have offered expert testimony that the property had an ongoing value. It is for the trier of fact to evaluate the credibility of this evidence. Accordingly, summary judgment is denied on this claim.

### 4. Tax Claim

 Although OBHC's argument with respect to its claims for lost profits and equity were lamentably lacking, some discussion was offered, justifying their survival. The same cannot be said of plaintiffs' alleged tax liability damage claim. Because OBHC has made no effort to defend it, we find that they

have abandoned this claim and grant summary judgment in Teachers' favor.

### III. Conclusion

For the foregoing reasons, we deny Teachers' motion for summary judgment on liability and grant in part and deny in part its motion for summary judgment on damages. It is so ordered.

---

**18.** We note that the paucity of plaintiffs' response to this element of Teachers' summary judgment motion comes as close to abandonment of a claim as is possible without actual forfeiture.