CELEX GROUP, INC., an Illinois corporation, and Celebrating Excellence, Inc., an Illinois corporation, Plaintiffs/counterclaim-defendants,

v.

The EXECUTIVE GALLERY, INC., an Ohio corporation, Defendant/counterclaim-plaintiff.

No. 94 C 1087.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 31, 1995.

Robert M. Kluchin, Malcolm McCaleb, Jr., Sharon R. Barner, Jeffrey A. Roth, Keck, Mahin & Cate, Kevin G. McBride, Jones, Day, Reavis & Pogue, Chicago, IL, for Celex Group, Inc. and Celebrating Excellence, Inc.

Thomas F. Gardner, Jones, Day, Reavis & Pogue, Chicago, IL, for Executive Gallery, Inc.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiffs Celex Group, Inc. and Celebrating Excellence, Inc. (collectively "plaintiffs" or "Celex") [1] sue The Executive Gallery, Inc. ("Executive Gallery"), alleging federal and common law trademark infringement (counts III and VII, respectively), Lanham Act and common law trade dress infringement (counts I, IV, V [Lanham Act] and VII [common law] ), common law unfair competition (count VI), copyright infringement (count II), violation of Illinois' Deceptive Trade Practices Act, 815 ILCS § 510/1 *et seq.* (count VIII), violation of Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1 *et seq.* (count VIII), breach of contract (count IX), account stated (count X), and unjust enrichment (count XI). Executive Gallery answered the complaint raising approximately eighteen "defenses" [2] and

---

1. Initially, the only named plaintiff in this action was *Celex Group, Inc.* However, *Celex Group, Inc.* subsequently moved successfully to add its wholly-owned subsidiary Celebrating Excellence, Inc. as an additional plaintiff. *See* Minute Order dated July 27, 1994.

2. *See* Am. Answer. Executive Gallery titled its answers to the allegations of the complaint, "First Defense." The "Second Defense" was

nothing more than a statement that "Executive Gallery denies each and every allegation of the Complaint which is not specifically admitted, denied or otherwise expressly referred to...." The other seventeen "defenses" purport to articulate a variety of legal theories precluding liability including: unclean hands, estoppel, waiver, consent and acquiescence, invalidity of trademark, invalidity of copyright, and preemption.

counterclaiming against plaintiffs—alleging "tortious interference with business opportunity" (counterclaim count I) and violation of Illinois' Consumer Fraud and Deceptive Business Practices Act (counterclaim count II). Presently before the court are the following motions by Celex: (1) Motion for Preliminary Injunction; (2) Motion to Dismiss [Counterclaims] or Alternatively for Summary Judgment; and (3) Motion for Summary Judgment on Counts IX, X, and XI.

## UNDISPUTED FACTS [3]

This lawsuit represents the unfortunate but somewhat inevitable fallout from the break-up of what appears to have once been a fairly close—if not, in some ways, symbiotic—commercial relationship between Celex and Executive Gallery. Celex Group, Inc. is an Illinois corporation with its executive offices in Lombard, Illinois. Celebrating Excellence, Inc. is also an Illinois corporation and is a wholly-owned subsidiary of Celex Group, Inc. Executive Gallery is an Ohio corporation with its principal place of business in Columbus, Ohio.

Celex sells motivational wall and desk products, business-oriented motivational books, desk accessories, stationary and clothing. Celex sells its products through retail stores, direct mail catalogs and magazine advertisements for telephone or mail order. In 1988, Celex released its first *Celebrating Excellence* catalog and distributed it by mail; Celex now mass mails its catalogs. In 1991, Celex opened its first retail SUCCESSORIES store.[4] At present there are more than sixty company owned and franchised stores and outlets. The stores sell Celex's proprietary product lines as well as an assortment of self-improvement products purchased wholesale from other vendors. Executive Gallery was one of the vendors that sold products to Celex's retail stores.

Executive Gallery is predominantly a family owned business operated by Marvin Williams (majority shareholder and CEO) and his children, Dwayne Williams (president) and Wendy Williams Fairbanks. Executive Gallery is engaged in the marketing and sale of its patented "Scan Card" time management systems and other executive products. Executive Gallery sells its products through direct mail mass marketing in three distribution channels: (a) mail order catalogs published under the name *Executive Gallery*; (b) direct-response advertisements in business-oriented magazines; and (c) direct-response advertisements in on-board airline magazines.[5] Just as Celex bought

---

3. The following recitation of background facts is drawn from the parties' Local Rule 12(M) and (N) statements of material facts as to which there is no genuine issue and the accompanying exhibits, *see* UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS LOCAL RULES Rule 12, as well as the various other pleadings and exhibits submitted to the Court in connection with the pending motions. Celex's Statement of Material Facts submitted in connection with its motion for summary judgment on Executive Gallery's counterclaims shall be cited as "Celex's Facts I ¶___." Executive Gallery's Local Rule 12(N)(3)(a) response to Celex's facts shall be cited as "Ex. Gallery's Facts I ¶___" and any additional facts set forth by Executive Gallery pursuant to Local Rule 12(N)(3)(b) shall be cited as "Ex. Gallery's Add'l Facts I ¶___." Celex's response to Executive Gallery's additional facts shall be cited as "Celex's Resp. Facts I ¶___." Celex's Statement of Material Facts submitted in connection with its motion for summary judgment on counts IX, X, and XI shall be cited as "Celex's Facts II ¶___." Executive Gallery's Local Rule 12(N)(3)(a) response to Celex's facts shall be cited as "Ex. Gallery's Facts II ¶___" and any additional facts set forth by Executive Gallery pursuant to Local Rule 12(N)(3)(b) shall

be cited as "Ex. Gallery's Add'l Facts II ¶___." Celex's response to Executive Gallery's additional facts shall be cited as "Celex's Resp. Facts II ¶___." All material facts set forth in either party's statement are deemed admitted unless controverted by the statement of the opposing party. Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir.1994); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir.1994). The Court also finds that these facts are without substantial controversy pursuant to its authority under Fed. R.Civ.P. 56(f) and will be deemed established for purposes of all subsequent proceedings.

4. In connection with the growth of its SUCCESSORIES retail operations, Celex renamed its catalog from *Celebrating Excellence* to *SUCCESSORIES*. *See* Anderson Dep. at 71–72.

5. In his affidavit, Dwayne Williams referred to airline magazine advertising as Executive Gallery's "most important sales and marketing channel." Williams also stated that Executive Gallery had "developed specialized and proprietary techniques to reduce the cost and thereby enhance the effectiveness of airline advertising, including the use of multi-page advertising inserts pre-

products wholesale from Executive Gallery and retailed them through its retail stores, Executive Gallery purchased Celex products at wholesale and then advertised and resold them through various channels. In 1992 and 1993, Executive Gallery was Celex's largest dollar volume customer.

Executive Gallery's first business transaction with Celex was to purchase Celex wall plaques at wholesale and then resell them through direct mail advertisements in airline magazines. Thereafter, from 1990 through 1993, Celex and Executive Gallery continued to purchase each other's products and advertise them in their respective catalogs and other marketing channels—generally without attribution as to source.[6] Additionally, Executive Gallery included Celex products in its airline magazine advertisements. Executive Gallery's president Dwayne Williams characterized the relationship between Executive Gallery and Celex as "a close, mutually beneficial and sharing relationship," D. Williams 7/8/94 Aff. ¶ 9, and Celex executives similarly characterized the relationship as "cooperative" and a "relationship of trust," Sexton Dep. at 59, 190, and a "sharing relationship," McKee Dep. at 101. However, despite these suggestive references, there was no partnership agreement (or other type of enterprise agreement) governing the relationship between these parties who were simultaneously competitors and wholesale vendors and customers of each other.[7]

■ In addition to buying and reselling each other's products, Celex and Executive Gallery entered into a number of agreements whereby they shared advertising mailing costs and, on some occasions, shared advertising space.[8] For instance, on several occasions Executive Gallery sold advertising space in its on-board airline magazine inserts to Celex. Celex controlled the content of the advertising space which it purchased from Executive Gallery and Celex's order forms accompanying its advertisements identified the source of its products as either "SUCCESSORIES" or "CELEBRATING EXCELLENCE." In such instances, customers purchased products directly from Celex. On at least one occasion in which the parties shared advertising space (*viz.*, November 1990 *Success* Magazine), the cover page of the parties' shared advertising space advertised both parties' products under the "Suc-

pared by Executive Gallery itself rather than the magazine publishers." While admitting that Executive Gallery uses such inserts and that this reduces the cost of airline advertising, Celex denied that this is "specialized and proprietary."

6. However, the Corporate Impressions® trademark was consistently used in conjunction with the Corporate Impression product line.

7. Celex maintains that the legal contours of the relationship between the parties was solely defined by agreements and contracts relating to "specific purchase orders and invoices for individual transactions and sales" and that "Executive Gallery's status as a wholesale customer of Celex was based upon individual purchase orders which involved differing quantities and kinds of goods at differing prices." Celex's Facts I ¶ 24. While admitting that there were no written agreements governing the relationship of the parties except for specific purchase orders and invoices, Executive Gallery maintains that Celex's chairman, president and chief executive officer Arnold "Mac" Anderson ("Anderson") represented to Dwayne Williams that "he agreed with the terms and conditions of Williams' proposed June 26, 1991 letter agreement, which set forth specific conditions pertaining to Executive Gallery's status as a wholesale customer and distributor of Celex, including conditions as to Executive Gallery's exclusive rights to airline advertising." Def.'s Facts I ¶ 24.

8. In response to Executive Gallery's Rule 12(n) statement that "Executive Gallery and Celex undertook at least 15 separate 'cooperative ventures' to share advertising space ...," which is properly supported by Dwayne Williams' affidavit, Celex responded, "Only two samples of joint advertising—the *Success* magazine ad and single flier have been brought to the attention of Celex at depositions, and Celex is therefore unable to confirm or deny that there were 15 separate ads or cost sharing fliers." Such a response is insufficient to controvert a properly supported factual assertion and therefore, for purposes of the motion for summary judgment, the fact is deemed admitted. *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir.1994); *see also South Cent. Bank & Trust Co. v. Citicorp Credit Servs., Inc.*, 863 F.Supp. 635, 643–44 n. 10 (N.D.Ill.1994) (finding that a denial of a Rule 12(M) statement of fact based on lack of knowledge is insufficient to controvert a properly supported factual statement). Since it is certainly within Celex's ability to review its records to ascertain the number of joint advertising ventures into which it entered with Executive Gallery, Celex's claim of lack of knowledge is plainly nothing but gamesmanship.

cessories" name.[9] Executive Gallery and Celex also frequently shared advertising photography and copy; and, Executive Gallery developed advertising for Celex. For example, Celex uses the following slogan, written by Executive Gallery to promote its "Corporate Impressions" posters: "First Class Imagery For Your Company Walls."

Celex and Executive Gallery made several attempts to reach agreements governing various aspects of their relationship—including the "sensitive" issue of exclusive advertising rights for Executive Gallery. On June 26, 1991, Dwayne Williams sent Mac Anderson a proposed distributorship agreement covering a five year term. In pertinent part, the letter provides:

> This letter will confirm our understanding regarding Executive Gallery, Inc. ("EGI") continuing to serve as a distributor for Celebrating Excellence ("CE").

> During the term of this continuing relationship, EGI will serve as a distributor for CE with the right to advertise, market and sell through EGI's marketing channels all of the products advertised, marketed or sold by CE ("CE Products"). This right shall be exclusive to EGI, and thus CE shall not, and shall not authorize others, to advertise, market or sell CE Products in the following markets:

> . . . . .

> 2. Airline magazines, magazine inserts and other materials distributed through the airline companies and designed for marketing goods to airline travelers.

Celex's Facts I, Ex. 10.[10] The letter ends with a request that Anderson confirm his agreement to the terms by signing and returning a copy of the letter. Anderson never signed the letter. Notwithstanding Executive Gallery's admission that Anderson never signed the letter, see Ex. Gallery's Facts I ¶ 21, Dwayne Williams maintains that Anderson told him that he agreed with the terms of the letter, see D. Williams 4/11/94 Dep. at 72; D. Williams 7/8/94 Aff. ¶ 17, and he further maintains that "On numerous occasions during the period from 1991 through 1993," Neil Sexton and Peter Walts—Celex's Senior Vice President of Direct Marketing and Celex's Senior Vice President of Business Development, respectively—as well as Anderson "each reaffirmed to me that as between the two companies, Executive Gallery had exclusive rights to advertise in the airlines." D. Williams 7/8/94 Aff. ¶ 17. Anderson denies ever telling Dwayne Williams that Executive Gallery could have exclusive airline advertising rights relative to Celex. Anderson Dep. at 448.[11]

---

**9.** The deposition testimony of Mac Anderson indicates that there was also a direct mail advertising flier promoting both Celex and Executive Gallery's products using the name "Successories" as "kind of a banner for the flier." Anderson Dep. at 120–22.

**10.** Dwayne Williams had previously sent Anderson a letter "to . . . present a few points [he felt] particularly strong about:"

> # 1. Exclusivity—I realise [sic] it would be unreasonable to expect an exclusivity arrangement, however in light of the substantial volume and investment we have and are continuing to make in promoting your products I would like exclusivity protection in two markets:

> . . . . .

> B.) Airlines—With the exception of joint advertising programs between CE and EGI, I am formally requesting that we be given exclusive marketing rights to advertise your products in airlines.

D. Williams 6/10/91 Letter to Anderson. Dwayne Williams states that about a week after writing to

Anderson, "Anderson told me that he agreed with my request for exclusive marketing rights in the airlines." D. Williams 7/8/94 Aff. ¶ 17. Anderson denies ever telling Dwayne Williams "that Executive Gallery could have an exclusive on airline advertising relative to Celex." Anderson Dep. at 448.

**11.** Celex's Rule 12(M) response to Executive Gallery's Rule 12(N)(3)(b) statement of additional facts requiring the denial of summary judgment is silent with respect to Executive Gallery's assertion—supported by Dwayne Williams' affidavit—that Sexton and Walts "each advised Dwayne Williams that Celex agreed to airline advertising exclusivity for Executive Gallery." Ex. Gallery's Add'l Facts I ¶ 19; D. Williams 7/8/94 Aff. ¶ 17. As a result of Celex's failure to deny this assertion, it is deemed admitted. Of course, the Court does not regard this as an admission that Celex and Executive Gallery had a formal or enforceable agreement regarding airline advertising exclusivity; rather, it is only an admission that Sexton and Walts made the representation that Celex agreed to airline advertising exclusivity for Executive Gallery.

Subsequently, on October 26, 1992, Anderson sent Dwayne Williams a copy of an agreement setting out the terms governing the parties' relationship for the period October 1, 1992 to December 31, 1993. Celex's Facts I, Ex. 11. Anderson's proposed agreement, which contained no provisions granting Executive Gallery exclusive advertising rights, was not signed by Williams. *See* Anderson Dep. at 452. Additionally, Anderson testified during his deposition that shortly after sending Williams the agreement in October of 1992, he explained to Williams that Celex wished to retain flexibility with respect to its ability to advertise in airlines and for that reason Celex would not agree to exclusive advertising rights for Executive Gallery.

Meanwhile, the parties were increasingly becoming competitors both for the sale of the same Celex products and because Executive Gallery was beginning to offer its own line of wall decor and other motivational products which competed with Celex's motivational products. In February of 1992, Executive Gallery created its "Productivity" series of posters and throughout 1992 and 1993 it created seven additional lines of motivational posters that competed with Celex's Corporate Impressions® line of motivational lithographs.[12] The Corporate Impressions® line is sold by Celex through its SUCCESSORIES catalog and the SUCCESSORIES retail stores. From its introduction in 1992 to the end of 1993 the Corporate Impressions® line was also sold at wholesale to Executive Gallery and others. Executive Gallery advertised the line through the Executive Gallery catalog and through Executive Gallery airline and other magazine advertisements. Throughout 1993, and perhaps earlier, Celex had expressed concern about the fact that both parties' catalogs carried some of the same products.

Another area of discord between the parties was Executive Gallery's refusal, despite Celex's repeated requests, to put references to SUCCESSORIES in Executive Gallery advertisements for Celex products. Indeed, the October 1992 agreement sent by Anderson to Dwayne Williams—and rejected by Williams—contained provisions requiring Executive Gallery to include references to SUCCESSORIES stores in its airline advertisements and catalogs.

By the summer of 1993, the number of Celex's retail stores greatly increased and Executive Gallery had definitively communicated to Celex that it would not include references to SUCCESSORIES stores in its airline advertisements which included Celex products. Accordingly, Celex determined that, after a suitable period of time related to the life of outstanding catalogs and advertisements, Celex would no longer sell its existing product lines to Executive Gallery or any other competitive catalog retailer unless that competitor agreed to include the SUCCESSORIES mark and logo. Celex also determined that in addition to its retail stores, catalog sales, and magazine advertising, it would sell wholesale to, and advertise in, SkyMall—an airline advertising catalog distributed in the seat back pockets of airplanes.[13]

On July 15, 1993, Dwayne Williams met with Anderson for lunch in Chicago. At that time, Anderson proposed acquiring a partial or total ownership interest in Executive Gallery. The two also discussed differentiating their catalog products no later than January 1, 1994. Later that day, Anderson confirmed his discussion with Williams in a letter indicating that as of January 1, 1994, Celex would "keep [its] existing product line (i.e., wall decor, books) for the Successories catalog" but that Celex would "create new lines to sell exclusively to The Executive Gallery and [Celex's] retail stores only." Five days

**12.** Celex owns Federal Trademark Registration Number 1789387, registered August 24, 1993, for the trademark CORPORATE IMPRESSIONS® for goods including lithographs and greeting cards and claiming a first use of March 12, 1992. *See* Compl., Ex. O. The CORPORATE IMPRESSIONS® Collection is one of the product lines that Celex claims was the subject of trademark and trade dress infringement by Executive Gallery in 1994. The intellectual property issues in this case are discussed later in this opinion.

**13.** Each airline has a different name for its onboard airline magazine and its SkyMall catalog. For example, United airlines calls its airline magazine *Hemispheres* and its SkyMall catalog *High Street Emporium*.

later, Celex confirmed with SkyMall its intention to advertise in the Fall 1993 SkyMall publications. SkyMall agreed to purchase Celex products at wholesale and to advertise those products with the SUCCESSORIES mark.

On July 28, 1993, Dwayne Williams and Neil Sexton, Celex's Senior Vice President of Direct Marketing, met at Williams' cabin. During that visit, Sexton brought to Williams' attention the fact that Peter Walts and Mac Anderson were exploring the idea of advertising in SkyMall; however, Sexton also indicated that he was not involved in that process and was not sure how far Walts and Anderson would go with it.[14]

At some time prior to August 2, 1993, Dwayne Williams conveyed to his father Marvin—Executive Gallery's chief executive officer—the substance of his conversations with Anderson and Sexton; specifically, Williams told his father of Anderson's merger proposal; Anderson's proposal to differentiate Celex and Executive Gallery's products by January 1, 1994; and that Sexton had communicated, in confidence, that Celex was considering advertising in SkyMall. On August 2, 1993, Marvin Williams sent Anderson a response to Anderson's letter of July 15, 1993, expressing his agreement that the two parties should work toward the January 1, 1994 timetable proposed by Anderson but requesting Anderson's commitment to continue furnishing Executive Gallery with product in the early part of 1994 so as to enable Executive Gallery to fill orders resulting from catalog and airline advertising already scheduled for late 1993.[15]

Marvin Williams met with Anderson in early August of 1993, at which time they discussed the possibility of a merger and differentiation of the two companies' products. In his deposition testimony, Marvin Williams stated that although Celex's advertising in SkyMall would have a "very serious" material impact on Executive Gallery, he did not raise the issue with Anderson during the August meeting because he believed it to be a rumor passed by Sexton in confidence and he did not want to jeopardize Sexton. M. Williams Dep. at 102, 105, 107. Williams also stated that he did not raise the issue because it was a very good, open, detailed meeting in which Anderson was "sharing ... all sorts of things that would be considered very detailed and confidential ... and I did not feel it was appropriate, in view of the progress of the meeting, to get into that subject, because it was obviously not true, because he would have said something about it if it were." *Id.* at 102–03. Anderson did not raise the issue.

In mid-August 1993, Executive Gallery, through Dwayne Williams, placed a series of purchase orders with Celex for a variety of Celex products in the total amount of $695,-706.25[16] at wholesale prices of 75% of the retail price and with a 120–day payment term. The order—the largest order Executive Gallery had ever placed with Celex—was made with the knowledge and consent of Marvin Williams.[17] In his deposition testimony, Dwayne Williams testified that Sexton's disclosure relating to Celex's exploration of advertising in SkyMall was not material to his decision to issue the order. D. Williams Dep. at 151–52. In his subsequent affidavit, Dwayne Williams explained that it was not material because his father, Marvin,

14. Based on Sexton's disclosure to Williams, Celex contends that Executive Gallery was aware that Celex intended, or was, at least, seriously considering selling to, and advertising its products in, SkyMall. Executive Gallery denies this, arguing that Sexton merely told Williams that he had heard a rumor that Celex was exploring the possibility of advertising in SkyMall and did not know how far Celex would go with the idea. Unfortunately, and remarkably—in light of the prominence of the issue—neither party has provided the court with any excerpts from Sexton's deposition in which he recounts precisely what he said.

15. In response to questioning during his deposition, Marvin Williams stated that he first considered Celex and Executive Gallery to be competitors when he read Anderson's letter of July 15, 1993—which he read sometime before August 2, 1993.

16. Orders for CORPORATE IMPRESSIONS® lithographs constituted $446,250.00 of the total order.

17. As majority shareholder and CEO, Marvin Williams was involved with all of Executive Gallery's major orders (*i.e.,* orders in excess of $100,000).

had met with Anderson in early August "and was convinced that the rumor was just that, a rumor, and that Anderson did not truly intend to advertise in the airlines against us." D. Williams 7/8/93 Aff. ¶ 30.

On September 16, 1993, Anderson informed Dwayne Williams by letter that Celex would be advertising its products in SkyMall beginning in October 1993. Marvin Williams responded to Anderson's letter on October 11, 1993, stating that he was "surprised" by the decision and that he felt "deceived" and "betrayed."

After September 1993 and through December 1993, Executive Gallery made significant payments to Celex on the August 1993 purchase orders; there remains, however, a substantial unpaid balance. In a letter dated February 3, 1994, from Executive Gallery's counsel to Celex's corporate attorney—apparently in response to a letter of January 24, 1994, sent by Celex's corporate attorney to Dwayne Williams regarding alleged infringement of some of Celex's products by some of Executive Gallery's products—Executive Gallery's counsel conceded that Executive Gallery owes Celex money but was going to withhold payment:

> Despite your statement that you do not wish to institute any legal proceedings, that threat is certainly implicit in your message and your past history on the litigation front in this area gives my client good cause for concern that you may choose to use the courts to bully my client into unwarranted submission. Any such legal battle could be damaging to my client, damages for which my client will hold you responsible. *Accordingly, my client wishes to resolve this matter before continuing to make payments it owes to Celex, so that if Celex chooses to pursue this matter and cause my client damages my client will have the ability to easily offset those damages without protracted litigation to recover them. We therefore must have your commitment on this before further payments are made.*

Celex's Facts I ¶ 60, Ex. 28, 2/3/94 letter to T. Dillon from D. Maher (emphasis added). Celex brings this lawsuit, among other reasons discussed later in this opinion, to recover payment on Executive Gallery's outstanding balances. *See* Compl., counts IX (breach of contract), X (account stated), and XI (unjust enrichment). Celex's motion for summary judgment on these counts is one of the motions presently before the court.

In response to Celex's lawsuit, Executive Gallery has counterclaimed against Celex alleging tortious interference with business opportunity (counterclaim count I) and violation of Illinois' Consumer Fraud and Deceptive Business Practices Act (counterclaim count II). The core of Executive Gallery's tortious interference count relates to Celex's entry into the airline advertisement marketing channel. In particular, Executive Gallery contends that by "invading" Executive Gallery's allegedly exclusive airline advertising province, Celex intentionally interfered with Executive Gallery's business expectancies with its past and prospective customers. Executive Gallery's deceptive business practices count also relates to Celex's decision to advertise in the airline advertising channel. Specifically, Executive Gallery accuses Celex of accepting Executive Gallery's $700,000.00 order under false pretenses by deliberately concealing the fact that it had arranged to advertise the same products in airline pockets thereby capturing and reducing the sales contemplated by Executive Gallery. Celex moves for summary judgment on both of these counterclaims.[18] The court shall address the counterclaim counts in turn.

*Summary Judgment Standards*

■ Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the

---

**18.** Celex's motion was captioned "Motion of Celex Counterclaim Defendants to Dismiss, or Alternatively, for Summary Judgment." In view of the extensive record submitted by the parties in support of, and in opposition to, the motion, the court shall treat it as a motion for summary judgment. *See* Fed.R.Civ.P. 12(b). In view of the fact that—in accordance with Local Rule 12—

Celex accompanied its motion with a statement of material facts as to which it contends there is no genuine issue and Executive Gallery submitted a response to Celex's statement along with supporting exhibits, the court finds that Executive Gallery had adequate notice and opportunity to present material pertinent to a Rule 56 motion for summary judgment.

moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990). However, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In determining whether a genuine issue exists, the court "must view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby*, 477 U.S. at 254, 106 S.Ct. at 2513. In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge when deciding a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513–14.

We begin our analysis of the merits of Celex's motions for summary judgment by considering Executive Gallery's counterclaims. Thereafter, we turn to Celex's motion for summary judgment on counts IX, X, and XI.

*Tortious Interference with Business Opportunity*

■ To prevail on its tortious interference counterclaim, Executive Gallery must prove the following: (1) Executive Gallery had a reasonable expectation of entering into a valid business relationship; (2) Celex knew of Executive Gallery's expectancy; (3) Celex purposefully interfered to defeat Executive Gallery's expectancy, preventing it from ripening into a valid business relationship; and (4) Executive Gallery suffered damages as a result of the interference. *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 170–71 (7th Cir.1993) (citing *Fellhauer v. City of Geneva*, 142 Ill.2d 495, 154 Ill.Dec. 649, 657, 568 N.E.2d 870, 878 (1991)). Additionally, if Celex's alleged interference is privileged, Executive Gallery must prove that Celex's conduct was malicious—which, in this context, means "intentional[ ] and without justification." *Id.*

Celex argues that it is entitled to summary judgment on Executive Gallery's tortious interference count on three grounds: First, Celex contends that Executive Gallery failed to adduce any evidence that it had a valid business expectancy of entering into business relationships with any specific, or identifiable, third parties. Second, Celex contends that Executive Gallery has failed to demonstrate that its alleged damages are proximately caused by Celex's conduct. Finally, Celex contends that its conduct is protected under the Illinois competitor's privilege.

■ The initial thrust of Celex's motion for summary judgment is that Executive Gallery has failed to prove that it had a valid expectation of entering into business with any identifiable third parties. Executive Gallery responds that it has adequately adduced evidence of an identifiable class of third-parties with whom it had a reasonable expectation of entering into business relationships—namely, corporate executives. The only evidence Executive Gallery offers in support of its claim of a reasonable expectancy of entering into a valid business relationship is the assertion in Dwayne William's affidavit that "based upon our specialized techniques and substantial airline advertising expenditures over the years, we have developed an established market with airline travelers, and particularly with business executives who are the most common airline travelers." Dwayne Williams 7/8/94 Aff. ¶5. Thus, we must determine at the outset whether this statement is sufficient to raise a genuine issue of material fact as to whether Executive Gallery has a valid business expectancy.

Almost without exception, Executive Gallery has directed to the court's attention to cases holding that a plaintiff is not required to specifically identify (*i.e.*, name) the third party with whom it has a business expectancy in order to satisfy the *pleading* requirements of the cause of action. *Derson Group Ltd. v. Right Management Consultants, Inc.*, 683 F.Supp. 1224, 1229 (N.D.Ill.1988); *Knapp v. McCoy*, 548 F.Supp. 1115, 1117 (N.D.Ill.1982); *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill. App.3d 524, 137 Ill.Dec. 409, 413, 546 N.E.2d 33, 37 (1989); *Crinkley v. Dow Jones and Co.*, 67 Ill.App.3d 869, 24 Ill.Dec. 573, 578–81, 385 N.E.2d 714, 719–22 (1978); *O'Brien v. State St. Bank & Trust Co.*, 82 Ill.App.3d 83, 37 Ill.Dec. 263, 265, 401 N.E.2d 1356, 1358 (1980). All of the foregoing cases were decided in the context of a Rule 12(b)(6) motion to dismiss (or its state equivalent). Plainly, the holdings in these cases, which address the adequacy of the *pleadings*, are not controlling when deciding a motion for summary judgment—wherein the issue is the adequacy of the *evidence*. In this regard, it is noteworthy that in *Crinkley*, the court observed that the pleading requirement of alleging an " 'identifiable' rather than 'identified' " third-party with whom the plaintiff had a business expectancy, "indicates that the third party's specific identity or name is to be revealed at a subsequent time, such as trial." *Crinkley*, 24 Ill.Dec. at 581, 385 N.E.2d at 722. Or, we might add, in opposition to a motion for summary judgment. However, in response to Celex's motion for summary judgment, Executive Gallery has not even attempted to identify any specific third parties with whom it had a reasonable business expectancy. Instead, it rests its opposition to Celex's motion

on the position that its past and prospective corporate executive customers "constitute an identifiable class for a tortious interference claim." Executive Gallery's Mem. Opp. Mot.Dis.Summ.J. at 9. This is insufficient. Although Executive Gallery's past and prospective corporate executive customers may constitute an identifiable class for purposes of allowing Executive Gallery to defeat a motion to dismiss, Executive Gallery must come forward with its evidence and identify particular third parties with whom it had a reasonable expectancy of entering into business to defeat a motion for summary judgment.

■ Executive Gallery's explanation that "the names of the entities with whom Executive Gallery has lost business opportunities has not yet been revealed in discovery simply because Celex has not sought to discover them," *id.* at 10, reflects a fundamental misapprehension of the nonmovant's burden in responding to a motion for summary judgment. It is well-established that a party opposing a motion for summary judgment must set forth specific facts showing that there is a genuine issue for trial; the party may not hold back evidence until trial but rather must present sufficient evidence to show that there is a triable issue. *See Camelot Care Ctrs. v. Planters Lifesavers Co.*, 836 F.Supp. 545, 554 (N.D.Ill.1993) ("[T]he opponent of a Rule 56 motion cannot 'hold back' evidence—if the motion is lost there is no second chance.") (quoting *Santella v. Grishaber*, 654 F.Supp. 428, 436 (N.D.Ill.1987)). Because Executive Gallery has failed to identify any specific third parties who actually contemplated entering into a business relationship with Executive Gallery,[19] we con-

---

19. Executive Gallery does not even attempt to address the requirement articulated in several Illinois opinions that the third parties actually contemplated entering into a business relationship with the plaintiff. *See e.g., Parkway Bank & Trust Co. v. City of Darien*, 43 Ill.App.3d 400, 403, 2 Ill.Dec. 234, 237–38, 357 N.E.2d 211, 214–15 (1976) (dismissing tortious interference claim where plaintiff failed to allege "a business relationship between the plaintiff and specific third parties or any clearly identifiable group of third parties contemplating prospective contractual arrangements with the plaintiff"); *Werblood v. Columbia College of Chicago*, 180 Ill.App.3d 967, 975, 129 Ill.Dec. 700, 705, 536 N.E.2d 750,

755 (1989) (dismissing tortious interference claim where plaintiff failed to allege that any potential employer contemplated employing her), *appeal denied*, 127 Ill.2d 644, 136 Ill.Dec. 610, 545 N.E.2d .134 (1989); *Heying v. Simonaitis*, 126 Ill.App.3d 157, 162, 81 Ill.Dec. 335, 339, 466 N.E.2d 1137, 1141 (1984) ("To state a cause of action, plaintiff is required to allege that a contractual arrangement with an identifiable third party is at least contemplated"). In the absence of such a requirement, liability under a theory of tortious interference with prospective business expectancies would be virtually without limit and impossible to calculate. We are aware of no

clude that it has failed to satisfy the first element of a claim for tortious interference with prospective business opportunity—*viz.*, that it had a reasonable expectation of entering into a valid business relationship.[20]

■ Executive Gallery's evidentiary shortcoming also spills over and ultimately undermines its showing on the fourth element of a tortious interference claim—*viz.*, damages caused by the alleged interference. The only evidence offered by Executive Gallery on the issue of damages is Dwayne Williams' conclusory statements such as: "Celex' airline advertising ... has caused Executive Gallery to lose the sales that it expected to result from its airline advertising" and "Executive Gallery has lost at least $2 million directly attributable to Celex' interference." However, in the absence of any supporting evidence showing that the behavior of present or prospective customers was

actually altered as a result of Celex's allegedly interfering conduct, Executive Gallery has failed to establish that it has suffered damages as a result of that conduct. For the foregoing reasons, we find that Executive Gallery has failed to meet its burden of establishing a genuine issue of material fact as to either its reasonable expectancy of entering into prospective business relationships or as to its damages resulting from Celex's conduct. Accordingly, summary judgment must be granted against Executive Gallery on its tortious interference counterclaim.[21]

*Deceptive Business Practices*

■ Executive Gallery contends that Celex violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("the Consumer Fraud Act" or "the Act") by falsely representing that it would not advertise on

authority indicating that the Illinois courts construe the expression "valid business expectancy" to encompass all *possible* relationships with *potential* customers regardless of whether such customers even ever contemplated a relationship with the plaintiff. Insofar as Executive Gallery invites this Court to hold that it had a valid business expectancy with the entire class of corporate executives who travel on the airlines, we decline the invitation. Rather, we hold that Executive Gallery can prevail on its tortious interference claim only by demonstrating the existence of third parties who actually contemplated a business relationship with it. Executive Gallery's evidence regarding its established market is insufficient in this regard. *See International Serv. Assocs., Inc. v. Arco Management*, 1994 WL 583302 * 7 (N.D.Ill.1994) (noting that plaintiff's prior track record in successfully obtaining contracts with HUD does not establish a reasonable expectation of business expectancy).

20. *Ashkanazy v. I. Rokeach & Sons, Inc.*, 757 F.Supp. 1527 (N.D.Ill.1991), does not compel a contrary conclusion. In *Ashkanazy*, the court denied the defendant's motion for summary judgment with respect to a tortious interference with prospective business expectancies count finding it "reasonable to expect" that without the interference of the defendant, the plaintiff would have continued to enjoy the business of its institutional customers. 757 F.Supp. at 1556. While the *Ashkanazy* court provided no explanation of why it found it "reasonable to expect" that the plaintiff would have continued business with his institutional customers, we find that at least two factual aspects of the *Ashkanazy* record distinguish that case from the instant case. First, the plaintiff in *Ashkanazy* sold kosher-for-Passover

foods and the uncontested record in that case indicated that the entire market share was captured between plaintiff and his competitor, with 75 to 80% of the market share attributable to the competitor and the remaining 20% attributable to the plaintiff. *Id.* at 1545. Thus, given that there were only two suppliers in the market, it reasonably follows that absent the defendant's interference the plaintiff would have continued to enjoy the business of its customers. Second, the parties in *Ashkanazy* were in the business of supplying a product that met a customer need which recurred on an annual basis—the need for kosher-for-Passover foods every Passover. Thus, there was some basis for reasoning that the plaintiff would have a continuing relationship with his customers. *Cf. Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill.App.3d 524, 137 Ill.Dec. 409, 546 N.E.2d 33 (1989) (finding that the plaintiff automobile dealer had adequately alleged an identifiable class of prospective customers where it alleged that 80% of its Saab purchasers returned for inspection services). In the instant case, Executive Gallery has offered no evidence suggesting that it had a reasonable expectation of continued business with its customers—either because its customers tend to return for repeated business or because there was no other source of motivational products. In the absence of some such evidence, the Court has no basis for concluding that Executive Gallery had a reasonable expectation of continued business with its customers.

21. Because we find that Executive Gallery has failed to establish a genuine issue of material fact as to these elements, we need not reach the issue of whether Celex's conduct is protected under the competitor's privilege.

the airlines and by failing to disclose—until after accepting Executive Gallery's offer to purchase approximately $700,000 worth of product—that it had, in fact, contracted to advertise on the airlines.[22]

The undisputed record in this case reveals that "on numerous occasions during the period from 1991 through 1993," at least two Celex Executives (Walts and Sexton) represented to Dwayne Williams that Celex would confer exclusive airline advertising rights to Executive Gallery. Ex. Gallery's Add'l Facts I ¶ 19; D. Williams 7/8/94 Aff. ¶ 17; *see supra* note 11.[23] It is also uncontroverted that although Celex confirmed its commitment to SkyMall to advertise its products in the SkyMall advertising catalog on July 20, 1993, and signed a final agreement with Sky-Mall on August 3, 1993, it did not disclose either of these facts to Executive Gallery until after Executive Gallery had placed its purchase orders totalling approximately $700,000 in mid-August 1993—notwithstanding the fact that Marvin Williams met with Mac Anderson on August 3, 1993, the very day that Celex finalized its agreement with SkyMall.[24] Additionally, Neil Sexton testified that he understood—based on his dealings with Dwayne Williams—that Executive Gallery was going to sell the products that were the subject of the $700,000 purchase order via Executive Gallery's catalogs and direct response advertising channels—most of which was airline advertising. Sexton Dep. at 140. Indeed, Sexton testified that he

expected that Executive Gallery would advertise the products in its airline advertising, *id.* at 141, and that it was foreseeable that Executive Gallery would be injured by Celex's advertising in the airlines, *id.* at 148. Executive Gallery predicates its statutory fraud count on Celex's alleged misrepresentations that Executive Gallery would have exclusive airline advertising rights as well as Celex's concealment of the fact that it had entered into an agreement to advertise in SkyMall until after it had accepted Executive Gallery's $700,000 purchase order.

In support of its motion for summary judgment, Celex advances the following positions: (1) The alleged omission is not actionable because Celex had no duty to disclose its agreement to advertise in SkyMall; (2) Executive Gallery's charge of concealment is undermined because Executive Gallery was on notice that Celex was considering advertising in SkyMall; (3) Executive Gallery's reliance on the alleged misrepresentations or omission was not reasonable; (4) The alleged misrepresentations and omission were not material.

 Section 2 of the Consumer Fraud Act provides, in pertinent part, as follows: Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression or omission of

---

22. Paragraph 14 of the amended counterclaim delineates several other instances of Celex's conduct which are incorporated by reference into Executive Gallery's deceptive business practices count and which presumably are thereby alleged to constitute deceptive business practices. Celex addressed these other instances of conduct in its memorandum in support of its motion for summary judgment arguing that the conduct cannot serve as the predicate for a claim of deceptive business practices. Executive Gallery did not respond to Celex's arguments. Because Executive Gallery has made no effort to defend its deceptive business practices claims based on this other conduct, the court deems that Executive Gallery has abandoned those claims. *Cf. Oak Brook Hotel Co. v. Teachers Ins. & Annuity Ass'n,* 846 F.Supp. 634, 641 (N.D.Ill.1994) (finding that plaintiff's failure to offer arguments in defense of a claim challenged in a motion for summary judgment constituted abandonment of the claim).

23. Additionally, at the very least, there is a genuine issue as to whether Anderson also represented to Williams that Executive Gallery would have exclusive advertising rights.

24. In its Rule 12(n)(3)(b) statement of additional facts, Executive Gallery states that Mac Anderson's letter dated September 16, 1993, announcing Celex's decision to advertise in Sky-Mall, "was Celex' first disclosure that it was, in fact, going to begin advertising in the airlines." Ex. Gallery's Add'l Facts I ¶ 37. In its response, Celex, adroitly dodges responding to this factual assertion and instead replies: "Celex denies that this was the first disclosure *of its intent* to advertise in SkyMall because of Neil Sexton's disclosure to Dwayne Williams...." Celex's Resp. Add'l Facts I ¶ 37 (emphasis added). Because Celex fails to controvert Executive Gallery's statement, the statement is deemed admitted.

such material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2. In *Siegel v. Levy Organization Dev. Co.*, 153 Ill.2d 534, 180 Ill.Dec. 300, 607 N.E.2d 194 (1992), the Supreme Court of Illinois set out the elements of a claim under the Consumer Fraud Act as follows:

[A]ll a plaintiff need prove to establish a violation of the Act is: (1) a deceptive act or practice, (2) intent on the defendants' part that plaintiff rely on the deception, and (3) that the deception occurred in the course of conduct involving trade or commerce. Significantly, the Act does not require actual reliance.

153 Ill.2d at 542, 180 Ill.Dec. at 304, 607 N.E.2d at 198. Notwithstanding the Illinois Supreme Court's clear statement that, "the Act does not require actual reliance," Celex remarkably cites *Siegel* for the proposition

that reasonable reliance *is* an element of a cause of action under the Consumer Fraud Act. *See* Celex's Mem.Supp.Mot. Dis.Summ.J. at 25.[25] Celex's position simply cannot be reconciled with the Illinois Supreme Court's unequivocal statement on this issue. Accordingly, we find that actual reliance is not required under the Consumer Fraud Act.[26]

In construing the Consumer Fraud Act—and in determining that actual reliance and diligence on the part of the plaintiff are not required under the Act, Illinois courts have repeatedly noted that the protection afforded by the Act is far broader than that afforded by the common law action for fraud. *See, e.g., Siegel v. Levy Organization Dev. Co.*, 153 Ill.2d 534, 180 Ill.Dec. 300, 607 N.E.2d 194 (1992) (agreeing that the Act "provides broader protection than common law fraud and that the consumer need prove fewer elements to satisfy a claim under the Act"); *Duhl v. Nash Realty Inc.*, 102 Ill.App.3d 483, 57 Ill.Dec. 904, 429 N.E.2d 1267 (1981); *Totz v. Continental Du Page Acura*, 236 Ill.

---

**25.** Celex also cites *Lionel Trains, Inc. v. Albano*, 831 F.Supp. 647, 649–50 (N.D.Ill.1993), *aff'd without opinion*, 35 F.3d 568 (7th Cir.1994), which relied, in turn, on *Elipas Enters., Inc. v. Silverstein*, 243 Ill.App.3d 230, 183 Ill.Dec. 752, 754, 612 N.E.2d 9, 11 (1993), for the same proposition. While both *Lionel Trains* and *Elipas* indeed state that reasonable reliance is an element of a cause of action under the Act, we are, of course, bound to follow Illinois' Supreme Court when applying Illinois law in a diversity action. Moreover, a brief comment on *Elipas* is in order. In *Elipas*, the First District of the Illinois Appellate Court found that private consumers seeking money damages—as opposed to the Illinois Attorney General or State's Attorney seeking injunctive relief—could not prevail under the Act without establishing reasonable reliance. 243 Ill.App.3d at 235, 183 Ill.Dec. at 755, 612 N.E.2d at 12. However, the *Elipas* court completely disregarded the fact that the plaintiff in *Siegel* was himself a private consumer seeking money damages. It was precisely in that context that the Supreme Court contrasted the elements of common law fraud with the elements of a cause of action under the Act and stated that a plaintiff need not prove actual reliance to state a cause of action under the Act. Therefore, we find *Siegel* to be the most authoritative pronouncement on the elements that must be proved by a private party under the Act. Accordingly, we respectfully decline to follow *Elipas* and its progeny. We note in this regard that at least one Illinois appellate district, citing *Siegel*, has also declined to follow *Elipas*, *see Zinser v. Rose*, 245

Ill.App.3d 881, 185 Ill.Dec. 574, 579, 614 N.E.2d 1259, 1264 (Ill.Ct.App.1993) ("We reject the recent decision of *Elipas* to the extent it holds that actual reliance must be established."), and one other post-*Siegel* opinion from this district has noted that actual reliance is not required under the Act. *Scotsman Group, Inc. v. Mid–America Distribs., Inc.*, 1994 U.S.Dist. LEXIS 4127, 1994 WL 118458 (N.D.Ill.1994).

**26.** *A fortiori*, reasonable reliance—or diligence on the part of the plaintiff—is not required. *See Grove v. Huffman*, 262 Ill.App.3d 531, 199 Ill. Dec. 830, 834, 634 N.E.2d 1184, 1188 (1994) (" 'A plaintiff . . . does not have to show actual reliance or diligence in ascertaining the accuracy of the misstatements.' " (quoting *Connor v. Merrill Lynch Realty, Inc.*, 220 Ill.App.3d 522, 530, 163 Ill.Dec. 245, 251, 581 N.E.2d 196, 202 (1991))); *Munjal v. Baird & Warner, Inc.*, 138 Ill.App.3d 172, 182, 92 Ill.Dec. 809, 818, 485 N.E.2d 855, 864 (1985) (same); *Beard v. Gress*, 90 Ill.App.3d 622, 628, 46 Ill.Dec. 8, 12, 413 N.E.2d 448, 452 (1980) (noting that the diligence of the injured party in investigating the accuracy of the misrepresentations is immaterial to the existence of a cause of action under the Act); *Grimes v. Adlesperger*, 67 Ill.App.3d 582, 585, 23 Ill.Dec. 743, 745, 384 N.E.2d 537, 539 (1978) ("[T]he [Act] . . . does not place a burden upon the plaintiff to check out the validity of the [misrepresentation].").

App.3d 891, 177 Ill.Dec. 202, 602 N.E.2d 1374 (1992).

In *Duhl v. Nash Realty Inc.*, 102 Ill. App.3d 483, 57 Ill.Dec. 904, 429 N.E.2d 1267 (1981), the court observed that:

Section 2 of the Act ... indicates a decisive move on the part of the Illinois legislature to enact broad protective coverage of consumers from the many types of deceptive or unfair selling and advertising techniques used by businesses. The sections clearly expand the consumer's rights beyond those of the common law, and provide broader consumer protection than does the common law action of fraud. There is a clear mandate from the Illinois legislature that the courts of this State utilize the Act to the utmost degree in eradicating all forms of deceptive and unfair business practices and grant appropriate remedies to injured parties.

Since the Act affords even broader consumer protection than does the common law action of fraud, it is clear that a plaintiff suing under the Act need not establish all of the elements of fraud as the Act prohibits any deception of false promise.

102 Ill.App.3d at 495, 57 Ill.Dec. at 914, 429 N.E.2d at 1277 (citations omitted).

 With the foregoing discussion of the Consumer Fraud Act in mind, we now address Celex's arguments *seriatim*. First, Celex contends that its alleged concealment of the fact that it had entered into an agreement to advertise in SkyMall is not actionable because it had no duty to disclose such information to Executive Gallery. In this regard, Celex maintains that "[a] duty to disclose arises only where there is a fiduciary relationship between the parties or where a party makes affirmative representations of material facts and omits to disclose additional facts necessary for full and fair disclosure or to correct a misapprehension of a material fact. *Coca Cola Co. Foods Div. v. Olmarc Packaging Co.*, 620 F.Supp. 966, 972–74 (N.D.Ill.1985)." Celex's Reply Supp.Mot. Dis.Summ.J. at 13–14. Celex may well be correct that under a theory of common law fraud, an omission is only actionable under

the circumstances set out in *Coca Cola Co.* (which involved an affirmative defense of common law fraud by omission). However, Celex has not directed the court to any persuasive authority holding that these requirements of common law fraud are incorporated into a claim of statutory fraud under Illinois' Consumer Fraud Act. Nor did Celex discuss the holding in *Totz v. Continental Du Page Acura*, 236 Ill.App.3d 891, 177 Ill.Dec. 202, 602 N.E.2d 1374 (1992) on this very issue.[27] In *Totz*, the defendant, a used car dealer, argued—relying on a case involving common law fraud—that it had no duty to disclose to a buyer that a vehicle had been previously damaged in an accident. *Id.*, 236 Ill.App.3d at 900–01, 177 Ill.Dec. at 208, 602 N.E.2d at 1380. The Illinois appellate court rejected the defendant's position noting that the case upon which the defendant relied "involved a common-law fraud action rather than an action pursuant to a consumer fraud statute." *Id.* The court further noted that:

The legislature intended the Act to expand the rights of consumers beyond those of the common law and to provide greater protection to consumers than does the common law action for fraud. Section 11a states that the Act "shall be liberally construed to effect the purposes thereof." This section provides a clear mandate to Illinois courts to utilize the Act to the greatest extent possible to eliminate all forms of deceptive or unfair business practices and provide appropriate relief to consumers. In light of the above, even if the *Henderson* [*v. Martin Burks Chevrolet, Inc.* (1987), 183 Ga.App. 868, 360 S.E.2d 430] court was correct in concluding that the dealership's failure to advise the purchaser of the accident damage did not constitute common law fraud, this would not preclude the existence of a remedy under the Act.

*Id.*, 236 Ill.App.3d at 901, 177 Ill.Dec. at 208–09, 602 N.E.2d at 1380–81. Accordingly, the court held that a defendant violates section 2 of the Act if it "conceals, suppresses, or fails to disclose a material fact to a consumer ... [and] intended the consumer to rely upon the

---

27. Celex was plainly aware of the *Totz* opinion as is evidenced by the fact that Celex cites *Totz* elsewhere in its brief. *See* Celex Reply Mot. Dis.Summ.J. at 12.

concealment, suppression, or omission." *Id.*, 236 Ill.App.3d at 903, 177 Ill.Dec. at 209, 602 N.E.2d at 1381. We concur with the analysis and holding in *Totz* and conclude that the common law requirement of a duty to disclose is not required in order for an omission or concealment to be actionable under the Consumer Fraud Act.[28]

 Next, Celex contends that insofar as Executive Gallery's statutory fraud claim is premised on Celex's concealment of the fact that it contracted to advertise in SkyMall, the "claim must fail because Executive Gallery was on notice that Celex was considering advertising its products in SkyMall prior to Executive Gallery's submitting its purchase orders for $700,000." Celex's Mem.Supp. Mot.Dis.Summ.J. at 26. However, Celex works a slight of hand here: Celex's alleged deception was not in failing to disclose the possibility that it might advertise in SkyMall; rather, the alleged deception was in failing to disclose the reality that it had already contracted to advertise in SkyMall beginning less than two months after Executive Gallery placed its purchase order. The record does not demonstrate that Executive Gallery was on notice of this critical fact. If Celex means to suggest that by virtue of being on notice that Celex was considering advertising in SkyMall, Executive Gallery was required to exercise diligence in determining the status of those considerations, we disagree. This suggestion ignores the Illinois courts' repeated determination that reasonable reliance or diligence is not an element or requirement of liability under the Act. *See Grove v. Huffman,* 262 Ill.App.3d 531, 199 Ill.Dec. 830, 834, 634 N.E.2d 1184, 1188

(1994); *Munjal v. Baird & Warner, Inc.,* 138 Ill.App.3d 172, 182, 92 Ill.Dec. 809, 818, 485 N.E.2d 855, 864 (1985); *Beard v. Gress,* 90 Ill.App.3d 622, 628, 46 Ill.Dec. 8, 12, 413 N.E.2d 448, 452 (1980); *Grimes v. Adlesperger,* 67 Ill.App.3d 582, 585, 23 Ill.Dec. 743, 745, 384 N.E.2d 537, 539 (1978). Indeed, it would be incongruous (at the very least) to hold that the act requires reasonable reliance when actual reliance is not even required, *see Siegel* 153 Ill.2d at 542, 180 Ill.Dec. at 304, 607 N.E.2d at 198.[29] Thus, Celex's argument that Executive Gallery's statutory fraud claim is defeated because Executive Gallery's reliance on either the alleged misrepresentations or omission was not reasonable—or, stated differently, because Executive Gallery did not exercise adequate diligence in verifying the facts—cannot withstand scrutiny.

 Equally without merit is Celex's argument that Celex's alleged misrepresentations and omission were not material to Executive Gallery's decision to place the $700,000 series of purchase orders. In support of this contention, Celex quotes an isolated passage from Dwayne Williams' deposition testimony in which Williams appears to concede that Neil Sexton's disclosure was immaterial with respect to Executive Gallery's $700,000 purchase order.[30] However, it is apparent from other portions of Williams' deposition that to the extent that Williams agreed that Sexton's disclosure was not material, it was because Sexton had only relayed that Celex was considering advertising in the airlines but had not made any definite advertising plans. *See* D. Williams 5/3/94 Dep. at 152 ("No commitments had been made at that

---

28. *But see Stefani v. Baird & Warner, Inc.,* 157 Ill.App.3d 167, 109 Ill.Dec. 444, 510 N.E.2d 65 (1987) (stating, in the context of a Consumer Fraud Act claim, that "[i]t is well settled that a concealment must have been done with the intention to deceive under circumstances creating an opportunity and duty to speak, but mere passive concealment of pertinent facts during a business transaction does not necessarily constitute a fraud). (*Lagen v. Lagen* (1973), 14 Ill.App.3d 74, 302 N.E.2d 201; *Skidmore v. Johnson* (1948), 334 Ill.App. 347, 79 N.E.2d 762.)" While *Stefani* involved a claim brought under the Act, it is not particularly illuminating insofar as it merely adopted without discussion the "duty to disclose" element required under common law fraud. In the absence of any acknowledgement

or discussion of the broad legislative intent underlying the Consumer Fraud Act, the *Stefani* court's uncritical incorporation of the common law element cannot be deemed controlling.

29. Thus, to the extent that there are some Illinois appellate opinions which include reasonable reliance as an element under the Act, we respectfully disagree and decline to follow those opinions.

30. The page on which the quoted passage appears was not submitted to the court along with the other pages from Williams' deposition transcript. Therefore, the Court is unable to fully understand the context within which the quoted passage appeared.

point.") Any ambiguity on this matter was subsequently addressed in Williams affidavit in which he states: "At the point in time when I issued these purchase orders in mid-august of 1993, I was of the view that Neil Sexton's disclosure to me on July 28 of the rumor about Celex airline advertising was immaterial because my father had already met with Mac Anderson in Chicago and was convinced that the rumor was just that, a rumor, and that Anderson did not truly intend to advertise in the airlines against us." D. Williams 7/8/94 Aff. ¶ 30.

Celex also argues that Sexton's disclosure must have been immaterial to Executive Gallery because if it were material Executive Gallery would have investigated the facts more diligently. However, this argument is unpersuasive for several reasons. In the first place, it must be noted that Celex has conveniently reframed the issue here: The issue is not the materiality *vel non* of Sexton's disclosure that Celex was considering airline advertising; rather, the issue is the materiality of Celex's actual decision to advertise in SkyMall. Second, even if the issue related to Sexton's disclosure, we cannot say as a matter of law that Executive Gallery's efforts at ascertaining the accuracy of that disclosure compel the conclusion that it was immaterial; at most, Celex raises an issue for the trier of fact as to whether Executive Gallery's conduct constitutes persuasive circumstantial evidence of immateriality. Finally, we consider Celex's arguments regarding Executive Gallery's efforts to investigate Celex's airline advertising plans to be nothing more than a renewed effort at attacking Executive Gallery's diligence in relying on Celex's alleged misrepresentations and omission. However, as was noted above, diligence on the part of the plaintiff is not required under the Consumer Fraud Act. For all of the foregoing reasons, the Court finds that a genuine issue of fact exists as to whether Executive Gallery considered Celex's concealment *of the fact that it had*

*committed to advertising in SkyMall* to be material.[31]

At this point, we have determined that, at the very least, a genuine issue of material fact exists as to the first element of a claim under the Act—*viz.*, a deceptive act or practice. The third element—that the deception occurred in the course of conduct involving trade or commerce—is not in dispute. Accordingly, we turn briefly to the second element—intent on the defendants' part that the plaintiff rely on the deception. Intent to deceive may be established by circumstantial evidence, *Ciampi v. Ogden Chrysler Plymouth, Inc.*, 262 Ill.App.3d 94, 111, 199 Ill.Dec. 609, 622, 634 N.E.2d 448, 461 (1994); *Totz*, 236 Ill.App.3d at 903, 177 Ill.Dec. at 210, 602 N.E.2d at 1382, and summary judgment is a particularly inappropriate vehicle for resolving disputes where the intent of the parties is at issue. *Lane v. Fabert*, 178 Ill.App.3d 698, 706, 127 Ill.Dec. 674, 679, 533 N.E.2d 546, 551 (1989). Under the facts of this case, we find sufficient circumstantial evidence of intent to deceive to raise a genuine issue of material fact sufficient to survive a motion for summary judgment. In particular, the record indicates that Celex was well aware of the great extent to which Executive Gallery relied on airline advertising for promoting and selling Celex products. Indeed, Neil Sexton testified that he understood and expected that Executive Gallery would advertise the products that were the subject of the $700,000 purchase order in its airline advertising and that it was foreseeable that Executive Gallery would be injured by Celex's advertising decision. Under the circumstances, a reasonable factfinder may infer that Celex concealed its agreement with SkyMall from Executive Gallery because disclosure of that agreement might undermine the ongoing negotiations concerning the $700,000 purchase order—the largest order that Executive Gallery (Celex's greatest dollar volume customer in 1992 and 1993) had ever negotiated with Celex.[32]

---

**31.** Celex does not explicitly challenge the materiality of the alleged misrepresentations or false promises allegedly made by Anderson, Walts, and Sexton regarding Executive Gallery's exclusive airline advertising rights. Accordingly, we do not reach that issue today.

**32.** Celex suggests that *Sider v. Outboard Marine Corp.*, 160 Ill.App.3d 290, 112 Ill.Dec. 35, 513 N.E.2d 449 (1987), *appeal denied*, 119 Ill.2d 575, 119 Ill.Dec. 398, 522 N.E.2d 1257 (1988), compels the conclusion that no genuine issue as to Celex's intent to deceive exists in this case. We

Because genuine issues of material fact exist as to all of the elements of a claim under the Act, Celex's motion for summary judgment on Executive Gallery's statutory fraud claim must be denied.

*Celex's Motion for Summary Judgment on Counts IX, X, and XI*

Counts IX, X, and XI of Celex's complaint assert claims of breach of contract, account stated, and unjust enrichment, respectively. Before addressing the legal merits of these claims, we shall set out some additional pertinent facts.

As previously noted, in mid-August, Celebrating Excellence, through Dwayne Williams, submitted to Celex a set of purchase orders totalling $695,706.25. Celex Facts II, Ex. G, Purchase Orders # 1857– # 1870.[33] From July 31, 1993 through February 26, 1994, Celex shipped products pursuant to Executive Gallery's purchase orders and sent invoices to Executive Gallery.[34] From August 1993 through January 20 1994, Executive Gallery made partial payments on certain of the invoices. In late December 1993, or early January 1994, Celex and Exec-

utive Gallery worked out a payment plan with Executive Gallery for payment of Executive Gallery's past due accounts receivable balance. The terms of this agreement were weekly payments of $50,000 to be applied to the oldest past due amounts. After an initial payment or two, Executive Gallery stopped making payments under this plan. Since then Executive Gallery has made no payments to Celex for the outstanding balance.[35] Celex has made repeated demands on Executive Gallery for payment of the outstanding balance and Executive Gallery has refused to pay. Celex maintains that, to date, an outstanding principal balance of $347,652.84 exists. Celex now moves for summary judgment on its breach of contract, account stated and unjust enrichment counts (IX, X, and XI, respectively).

Executive Gallery's opposition to Celex's motion for summary judgement on counts IX, X, and XI is fundamentally premised on its contention that it is entitled to offset various amounts from the sum it admits owing to Celex. In particular, Executive Gal-

---

disagree. In *Sider*, the plaintiff, a "Lawn Boy" distributor sued the defendant alleging, among other things, that the defendant concealed its plan to terminate its relationship with the plaintiff. The trial court granted summary judgment in favor of the defendant and the appellate court affirmed, finding that the evidentiary facts relied on by the plaintiff did not tend to prove the existence of a plan to conceal the decision to terminate the plaintiff's distributorship agreement. However, in reaching this decision, the appellate court relied heavily on the uncontradicted testimony by the defendant's past and present employees which indicated that no advance decision to terminate the plaintiff's distributorship agreement, as alleged by the plaintiff, was made. *Id.*, 160 Ill.App.3d at 297–98, 112 Ill.Dec. at 39–40, 513 N.E.2d at 453–54. Because the court credited the testimony that no advance decision was made, it followed naturally that there could be no intent to conceal the nonexistent advance decision. In the instant case, it is undisputed that Celex had confirmed its agreement with SkyMall several weeks before Executive Gallery placed its order. Thus, the facts of this case more readily admit of the inference that Celex intended to conceal its previously reached agreement with SkyMall during the pendency of its negotiations with Executive Gallery.

33. Celex contends that Executive Gallery also ordered products pursuant to purchase orders 1850, 1852, 1000110, 1000252, 1000276,

1000359, 1000360, 1000392, 1000393, and an unnumbered purchase order. Celex's Facts II ¶ 14. Executive Gallery denies that it has any liability for purchase orders 1852 and 1850 because it has no record of the former and because its records indicate that shipment of order 1850 was received in August of 1993 and that it has "no record of submitting a purchase order number 1850 for a February 26, 1994 shipment." Hickey Aff. ¶ 8. Executive Gallery also denies ever receiving the invoices or the products on invoice numbers 188157, 188158, and 188295. Hickey Aff. ¶ 7.

34. Executive Gallery admits receiving all but three of the thirty-nine invoices identified in paragraph 16 of Celex's 12(M) statement. By its failure to respond to Celex's factual assertion, Executive Gallery is also deemed to have admitted that it received and accepted the products identified in all but those three invoices. The court does not find copies of the three invoices among the invoices submitted by Celex. Accordingly, a genuine issue exists as to whether any amounts are owing under these invoices.

35. As will be discussed more fully below, Executive Gallery maintains that "[i]n 1994, [it] determined that it was entitled to deduct its damages caused by Celex's breach of contract from the remaining money due on the invoices." Executive Gallery's Facts II ¶ 18.

lery contends that it is entitled to offset its damages from Celex's alleged breach of the purported airline advertising exclusivity agreement and that it is entitled to offset various amounts owed to it by Celex in connection with purchases made by Celex. Neither of these positions is sustainable.

■ Apart from the conclusory and self-serving statements by Dwayne Williams, there is not a shred of evidence in the record to support the notion that Executive Gallery's purchases of Celex's products were specifically "contingent" upon the purported exclusivity agreement. While the evidence in the record raises a question as to whether there ever was such an agreement in the first place, even when we construe the evidence in the light most favorable to Executive Gallery, that evidence suggests that the exclusivity agreement was—at best—an element of Celex's distributorship agreement with Executive Gallery. Dwayne Williams' letter of June 26, 1991 to Mac Anderson, upon which Executive Gallery places much emphasis, begins as follows:

> This letter will confirm our understanding regarding Executive Gallery, Inc. ("EGI") continuing to serve as a distributor for Celebrating Excellence ("CE").
>
> During the [5 year] term of this continuing relationship, EGI will serve as a distributor for CE with the right to advertise, market and sell through EGI's marketing channels all of the products advertised, marketed and sold by CE ("CE Products"). This right shall be exclusive to EGI....

D. Williams 6/26/91 Letter to Anderson. Thus, it is evident that Williams presented the exclusivity agreement as a term of the parties distributorship agreement—which, in any event was never signed by Anderson. And, it is with respect to this exclusivity

agreement that Williams testified that Anderson orally agreed. No evidence in the record indicates that this exclusivity agreement was incorporated by reference into Executive Gallery's purchase orders or otherwise made a condition to the purchase of Celex's goods by Executive Gallery.

■ The well-established rule with respect to section 2–717 of the Uniform Commercial Code (which Executive Gallery seeks to invoke) is that any damages a buyer seeks to set-off from the amount due under a sales contract must arise from a breach of the same contract under which the seller is attempting to collect.[36] *See Schieffelin & Co. v. Valley Liquors, Inc.*, 823 F.2d 1064, 1067 (7th Cir.1987) (applying Illinois law); *Rebaque v. Forsythe Racing Inc.*, 134 Ill.App.3d 778, 782–83, 89 Ill.Dec. 595, 480 N.E.2d 1338 (1985). In *Schieffelin*, the Seventh Circuit rejected the contention that a breach of a separate term of a distributorship agreement entitled the distributor to a set-off on amounts owing to the supplier—notwithstanding the fact that the distributorship agreement contemplated sales by the supplier to the distributor:

> It is true in our case that the distributorship agreement contemplated sales by [supplier] to [distributor]. As to any sale, however, the price, type, and quantity of goods sold resulted from accepted purchase orders and not from the distributorship agreement.

823 F.2d at 1067. This general principal has been recognized by many courts outside of this jurisdiction. *See, e.g., Travenol Labs., Inc. v. Zotal, Ltd.*, 394 Mass. 95, 474 N.E.2d 1070, 1072–73 (1985) ("it is well established that the buyer's obligation to pay for goods tendered and accepted does not arise under the 'same contract' as the alleged breach of an exclusive dealing or distributing arrange-

---

**36.** Section 2–717 of the Uniform Commercial Code provides:

> The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due *under the same contract.*

U.C.C. § 2–717 (emphasis added). The official comments to this section state: "To bring this provision into application the breach involved

must be of the same contract under which the price in question is claimed to have been earned." *Id.,* Official cmt. 1. Both Illinois and Ohio have adopted this provision verbatim. *See* 810 ILCS 5/2–717; Ohio Rev.Code Ann. § 1302.91. Because the parties have not briefed the choice of law issue, and because there is no material difference between the laws of Illinois and Ohio on this issue, this court shall apply the law of the forum state, Illinois.

ment by the seller") (internal quotes omitted); *Carlisle Corp. v. Uresco Constr. Materials, Inc.*, 823 F.Supp. 271, 273–275 (M.D.Pa.1993) (holding that a distributorship agreement was a separate contract from purchase orders); *Hellendall Distributors, Inc. v. S.B. Thomas, Inc.*, 559 F.Supp. 573, 574 (E.D.Pa.1983), *aff'd*, 755 F.2d 920 (3d Cir. 1985). Accordingly, the Court holds that Executive Gallery is not entitled to set-off from the amount due to Celex on the outstanding invoices any amount of claimed damages resulting from Celex's alleged breach of any airline advertising exclusivity agreement.[37]

The court also finds no admissible evidence in the record to support Executive Gallery's claim that it was entitled to offset $64,949.00 (for products ordered by and shipped to Celex) due to the existence of "a long-standing agreement" between the parties to offset from their respective accounts any debts owed to each other. The only evidence in the record bearing on the existence of this agreement is the self-serving statement to this effect in the affidavit of Michael Hickey, Executive Gallery's Vice President of Finance and Administration. Hickey's affidavit simply asserts

> Executive Gallery and Celex had a long-standing agreement concerning the purchase of each other's products and/or services. Pursuant to their agreement, Celex would credit Executive Gallery's account for amounts Celex owed to Executive Gallery, and Executive Gallery would credit Celex's account for any amounts Executive Gallery owed to Celex.

Hickey Aff. ¶ 9. However, the Hickey affidavit provides no foundation as to *who* had entered into this agreement or when the agreement was entered into. Nor is any corroborative evidence of this agreement provided. We note that conclusory assertions, unsupported by specific facts, made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a prop-

er motion for summary judgment. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990) ("The object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985) ("Conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact"). Accordingly, we find no genuine issue as to whether Executive Gallery is entitled to offset amounts owed to it by Celex from the amount owed by Executive Gallery under the invoices.

For purposes of this motion for summary judgment, we find that Executive Gallery is not entitled to offset any amounts from the sum it owes to Celex for goods ordered and accepted by Executive Gallery. At this point, finding no merit in Executive Gallery's arguments concerning its entitlement to a set-off, the court grants Celex's motion for summary judgment on Counts IX, X, and XI, in part. With respect to the damages recoverable under these counts, the Court finds that Executive Gallery has admitted that it owes Celex $278,595.46, *see* Executive Gallery's Facts II ¶ 24, and Executive Gallery asserted that it has applied $64,949.00 toward the payment of Celex's invoices. In view of the Court's holding that Executive Gallery is not entitled to such a set-off, we find there to be no dispute as to the fact that Executive Gallery owes Celex $343,544.46 ($278,595.46 + $64,949.00).[38] Accordingly, pursuant to Rules 56(a) and 56(d), the Court hereby grants partial summary judgment in favor of Celex on Counts IX, X, and XI in the amount of $343,544.46. These counts remain for trial only with respect to the $4,108.38 which remains in dispute.

*Celex's Motion for Preliminary Injunction*

From approximately 1990 through 1993, Executive Gallery purchased and resold Ce-

---

37. In view of the Court's holding on the inapplicability of § 2–717, we need not reach the issue of whether the purported exclusivity agreement is unenforceable under the statute of frauds.

38. Celex sought relief in the amount of $347,652.84, the difference of $4,108.38 is presumably due to disputed invoices or other disputes concerning the proper crediting of Executive Gallery's account.

lex products. At various times during this period, these products included Celex's Corporate Impressions® series of lithographs and cards, Celex's line of brass-on-walnut plaques, and Celex's gold-on-blue cards. By 1994, Celex had stopped supplying Executive Gallery with these products. Rather than abandon the market which they claim to have developed for Celex's products, Executive Gallery replaced these three Celex product lines with new product lines of its own. Executive Gallery's Mem.Opp.Mot.Prelim.Inj. at 10. Celex contends that Executive Gallery's Corporate Images™ line infringes the Corporate Impressions® trademark and trade dress, and that Executive Gallery's newly created line of brass plaques and gold-on-blue cards infringes the respective trade dresses of Celex's products.[39] Accordingly, Celex seeks a preliminary injunction barring Executive Gallery from infringing the trademark and trade dress of Celex's Corporate Impressions® series, and from infringing the trade dress of the brass plaque and gold-on-blue card product lines.[40]

Executive Gallery opposes Celex's motion on five independent grounds: (1) Celex's trade dresses are not protectible because they have not acquired secondary meaning and are not distinctive; (2) Celex's trade dresses are not protectible because they are functional; (3) Celex has "waived" its rights due to the confusing manner in which it has caused its products to be advertised [41]; (4) Celex cannot enforce rights in misappropriated product names and features [42]; and (5) Celex has not been irreparably harmed.

■ Although the Court is disposed—based on the present record—to grant Celex's motion for a preliminary injunction, the Court has concluded that before ruling on the merits of Celex's motion, it would be prudent to conduct an evidentiary hearing, pursuant to Rule 65(a)(2), for the purpose of more thoroughly developing the factual rec-

---

**39.** As is not unusual in intellectual property cases, Celex, now the plaintiff, was previously named as the defendant in a similar dispute brought by the G. Neil Companies, a Florida corporation. *G. Neil Companies v. Celex Group, Inc.*, No. 93–6394 (S.D.Fla.). In that action, G. Neil Companies sued Celex alleging that Celex's Corporate Impression series infringed the trade dress of G. Neil's "Performance Collection" series of lithographs. Celex's answer to the complaint, served on June 14, 1993, pleaded as an affirmative defense that the motivational lithographs produced by G. Neil Companies had a generic trade dress and were unprotectible. *See* Celex's Reply Supp.Mot.Prelim.Inj., Ex. 12, Celex's Answer, Affirmative Defenses, and Counterclaims ¶ 85–89. Executive Gallery has pleaded a similar defense, claiming that the motivational lithographs produced by Celex have a generic trade dress and are unprotectible, alternatively Executive Gallery claims that the trade dresses at issue are unprotectible because they are functional. Celex, on the other hand, asserts that the trade dresses are inherently distinctive and that "[n]one of the characteristics that together make up the CORPORATE IMPRESSIONS® trade dress is legally 'functional'." Pl.'s Mem.Supp.Mot.Prelim.Inj. at 9.

**40.** Although Celex's complaint also asserts a copyright claim, Celex has not sought a preliminary injunction on its claim of copyright infringement. *See* Celex's Mem.Supp.Mot.Prelim.Inj. at 7 n. 2.

**41.** As has been noted elsewhere in this opinion, Celex appears to have allowed Executive Gallery

and other catalog advertisers to advertise Celex's products without attribution as to source.

**42.** Executive Gallery asserts that the trademark and trade dress of Celex's Corporate Impression® series is unprotectible because Celex has misappropriated both the trademark and the trade dress of this series. Executive Gallery claims that Celex misappropriated the name "Corporate Impressions" from David Kane, a former Celex franchisee, who used this mark before Celex in connection with his business "Corporate Impressions of America, Inc." an Illinois corporation. Executive Gallery Am. Answer ¶ 94(d). Executive Gallery also claims that Celex copied features of G. Neil Companies' "Performance Collection" series of lithographs when Celex developed the Corporate Impression® line, including the following features: large size, titles in large typeface followed by thematic message, dramatic theme photographs and related messages and the use of block borders or backgrounds. Executive Gallery Am. Answer ¶ 94(c). Executive Gallery also claims that Celex misappropriated many of motivational passages which it uses for the Corporate Impression® series. Executive Gallery asserts that the motivational statement which accompanies Celex's "GOAL" Corporate Impression® lithographs and cards was taken from the children's book *There Will Never be Another You* written by Don Zadra and published in 1986 by Creative Education, Inc. Executive Gallery also claims that the motivational statements which accompany the "ADVERSITY" and "TEAM" Corporate Impression® lithographs and cards were misappropriated.

ord. In an effort to provide focus to the parties, the Court shall briefly review the pertinent facts, set out the controlling legal standards, and highlight issues in need of fuller factual development.

Celex's Corporate Impressions® series is a collection of lithographs and cards which use visual images, accompanied by a short textual message, to illustrate a motivational concept. For example, one Corporate Impressions® lithograph consists of a picture of a sculling crew that sits above the word "TEAMWORK" (the motivational concept) printed in large letters followed, in smaller print, with the words "TEAMWORK IS THE ABILITY TO WORK TOGETHER TOWARD A COMMON VISION. THE ABILITY TO DIRECT INDIVIDUAL ACCOMPLISHMENT TOWARD ORGANIZATIONAL OBJECTIVES. IT IS THE FUEL THAT ALLOWS COMMON PEOPLE TO ATTAIN UNCOMMON RESULTS."[43] Celex claims the Corporate Impression® series is protectible trade dress, contending that "Each CORPORATE IMPRESSIONS® work is characterized by fifteen non-functional graphic features that combine to produce an inherently distinctive

and highly uniform overall 'look' or appearance." Celex's Mem.Supp.Mot.Prelim.Inj. at 2.[44]

Executive Gallery's Corporate Image Series™ is a collection of lithographs which also use a visual image (a photograph) placed above a large print motivational/inspirational word followed, in smaller print, with a textual message. For example, one Corporate Image Series™ lithograph consists of a photograph of a sailing team that sits above the word "TEAMWORK" printed in large type followed, in smaller print, by the words "There is no limit to what can be accomplished if it doesn't matter who gets the credit."[45] Executive Gallery's 1994 catalogs advertised the lithographs with a promotional banner reading, "NEW! CORPORATE IMAGE SERIES™ *with a spirit of adventure!* ". Significantly, Dwayne Williams testified that, in working with outside design firms to develop a line of lithographs competitive with the CORPORATE IMPRESSION® Series, he showed the designers the CORPORATE IMPRESSION® lithographs.[46] D. Williams 5/3/94 Dep. at 194–96.

**43.** Another Corporate Impressions® lithograph consists of a picture of two lone sailboats in an expansive body of water at dusk with a full moon in the background, accompanied by the word "RISK" printed in large text followed by the words "YOU CANNOT DISCOVER NEW OCEANS UNLESS YOU HAVE THE COURAGE TO LOSE SIGHT OF THE SHORE".

**44.** Celex identifies the fifteen elements as follows:
(1) Unusual 24″ × 30″ size;
(2) Horizontal or vertical orientations;
(3) A Roman Serif Typeface ("New Baskerville");
(4) Ratio between the size of the title and the size of the quote or message of approximately 5 to 1 or 6 to 1;
(5) Title tint matching predominant color in photograph;
(6) Large, solid black borders;
(7) Photograph oriented above title and quotation;
(8) Photograph occupying approximately 50% of entire lithograph (sq. inches);
(9) 65 lb. cover weight (glossy enamel paper stock);
(10) Text of message or quotation is reversed (white on black);
(11) Text of message or quotation in "small caps" (also Roman Serif typeface);
(12) Individual letters of title separated by graphic elements called "bullets";

(13) Narrow band in same color as title surrounds photo;
(14) High gloss black aluminum frame;
(15) Narrow range of predominant colors.
Compl. ¶ 12.

**45.** Another Corporate Image Series™ lithograph consists of a photograph of a person bungee jumping out of a hot air balloon above the word "RISK" printed in large type followed, in smaller print, by the words " 'Security is mostly a superstition. It does not exist in nature ... life is either a daring adventure or nothing.' Helen Keller".

**46.** The Court's visual inspection of the lithographs as advertised in the parties' respective catalogs reveals the following. The photographs in both the Corporate Impressions® and Corporate Images™ lithographs are set against a black background—although, in the Corporate Impressions® lithographs, the black background completely surrounds the photograph whereas in the Corporate Images™ lithographs, the photograph extends all the way to the top border of the lithograph and hence the black background is only visible along the sides and bottom of the photograph. In both series, the photograph is bordered by a thin colored line. Again, however, in the Corporate Impressions® lithographs the colored line borders the photograph continuously along all four sides whereas in the Corporate Images™ lithographs the colored border line is

Celex also claims a protectible trade dress in its line of 8″ × 10″ brass plaques which consist of brass plates mounted on walnut-finished frames and imprinted with motivational titles (*e.g.*, "Success" "Courage") and related textual messages. Celex contends that the plaques share seven common characteristics giving rise to a distinctive and uniform trade dress.[47]

Executive Gallery's 1994 catalog advertises a line of 8″ × 10″ plaques presented as "our newly redesigned plaques" which are a collection of brass plates mounted on walnut frames. Like Celex's plaques, Executive Gallery's plaques contain a thematic word or phrase (*e.g.*, "Effort" "Goals") followed by related text. The promotional copy in the catalog boasts, "And we've even improved the graphics! What a difference the added quality makes!"[48]

Finally, Celex claims a protectible trade dress in its line of gold-on-blue cards which is "a series of 6½″ × 4½″ greeting cards having gold-stamped motivational or congratulatory messages set against a rich, blue laid card stock." Pl.'s Mem.Supp.Mot.Prelim.Inj. at 2. The 1994 Executive Gallery catalog also presents a line of gold-on-blue cards, promoted as "New! with impressive Raised Foil Lettering". Celex contends that the trade dress of its gold-on-blue card line is infringed by Executive Gallery's line.[49]

*Preliminary Injunction Standards*

■ To prevail on its motion for a preliminary injunction, Celex must show "(1) that the case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; [and] (3) that the movant will suffer irreparable harm if the injunction is

---

interrupted by the photograph on the top and by the large print motivational word on the bottom. The fonts used in the large type motivational word are similar although not identical and the letters of this word in the Corporate Impressions® series are separated by a bullet (●) whereas they are not so separated in the Corporate Images™ lithographs. The Court cannot discern the type of the smaller print text in the Corporate Images™ lithographs and so we attempt no comparison here.

47. Celex identifies the seven characteristics as:
 (1) 8″ × 10″ (overall) size walnut finish plaque;
 (2) Brass plate centered on plaque;
 (3) Black imprinting on brass plate;
 (4) Bold theme over italic print quotation or message;
 (5) Three line black border;
 (6) Order for six (6) or more sold with presentation award; and
 (7) Physically adapted to be mounted on wall or used with available desktop easel.
 Compl. ¶ 17.

48. The Court's comparison of the 1993 *Successories* catalog, Anderson Aff.Ex. 1, at 38–40, which presents Celex's line of brass plaques, with the 1994 *Executive Gallery* Catalog, McKee Aff.Ex. 4, at 36–37, which presents Executive Gallery's brass plaques reveals the following similarities an differences:
 ● Both series of plaques utilize a short (typically one word) motivational message followed by a longer statement printed in black on a brass plaque;
 ● Celex generally uses large, italic lettering for the entire title; Executive Gallery generally uses a large script typeface for the first letter of the title and completes the title in smaller all capital common looking typeface. The subse-

quent text is in italics for both series of plaques;
 ● Celex employs a three line border while Executive Gallery uses a two line border;
 ● Executive Gallery uses two lines to bracket the title and text, with the top line interrupted by the title and the bottom line containing a diamond bullet at its center;
 ● Celex does not use screws to fasten its plates to the wood support; Executive Gallery does use screws;
 ● Celex's plaques are "crafted with the look of brass and walnut" with a solid brass plate; Executive Gallery advertises both a solid brass plate and a solid wood base;
 ● Both series of plaques employ beveled edges, however, the bevel on the Executive Gallery plaques is substantially more prominent;
 ● Both parties provide personalized plaques with purchases of six or more plaques.

49. A comparison of the 1993 *Successories* catalog, Anderson Aff.Ex. 1, at 43, and the 1994 *Executive Gallery* Catalog, McKee Aff.Ex. 4, at 34, reveals the following with respect to the gold-on-blue cards:

 ● Celex uses 6¼″ × 4½″ gold-on-blue cards; Executive Gallery uses 6¼″ × 4½″ gold-on-blue cards.
 ● Celex does not use a consistent typeface on its cards and generally uses larger text for one or two words; Executive Gallery consistently combines three typefaces on each card, a large script typeface for a single letter only and an italic and common typeface.
 ● Celex does not employ any consistent graphical element; Executive Gallery consistently brackets its text with single lines above and below the text, generally with one of the lines being interrupted by the large script letter.

not granted." *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 313–14 (7th Cir. 1994). If Celex succeeds in making this threshold showing, "then the court must balance the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently." *Id.* at 314. The balance of relative harms analysis involves a "sliding scale" analysis: "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 387 (7th Cir.1984); *see also Storck*, 14 F.3d at 314. Finally, the court must consider the public interest in whether or not to issue the injunction—meaning the effect of the grant or denial of the injunction on nonparties. *Storck*, 14 F.3d at 314; *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir. 1994). "In trademark infringement cases, . . . 'the relevant consideration [in determining whether the public interest will be disserved by the grant of an injunction] is the consumer's interest in not being deceived about the products they purchased.'" *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir.1988) (quoting *A.J. Canfield v. Vess Beverages, Inc.*, 796 F.2d 903, 909 (7th Cir. 1986)).

The Seventh Circuit has long recognized that "the damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law." *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 858 (7th Cir.1982).[50] In the instant case, the Court is satisfied that the threatened harm to Celex by Executive Gallery's alleged trademark and trade dress infringement is irreparable and not susceptible to an adequate remedy at law. Accordingly, the Court's focus, with respect to Celex's threshold showing, is principally on Celex's likelihood of success on the merits.

Celex seeks relief under section 32 of the Lanham Act, 15 U.S.C. § 1114, which protects registered trademarks, and section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides protection to unregistered trade dress. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). The Seventh Circuit has described "trade dress" as "refer[ring] to the total image of a product, including size, shape, color combinations, graphics, packaging and label." *Badger Meter Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1151 (7th Cir.1994); *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, —— n. 1, 112 S.Ct. 2753, 2755 n. 1, 120 L.Ed.2d 615 (1992); *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 935 (7th Cir.1989), *cert. denied*, 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030).[51]

---

50. As this Court recently explained in *Ideal Industries [Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir.1979) ], this readiness to find irreparable injury arises in part from the realization that "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another." quoting 4 R. Calmann, "Unfair Competition, Trademarks and Monopolies," section 88.3(b) at 205 (3rd ed. 1970).
*Processed Plastic*, 675 F.2d at 858.

51. It is established that the "trade dress" of a product may inhere in the design of the product itself. As the court noted in *National Presto Indus., Inc. v. Dazey Corp.*, 18 U.S.P.Q.2d (BNA) 1113, 1118 (N.D.Ill.1990), *aff'd*, 949 F.2d 402 (Fed.Cir.1991):

"Trade dress" as the words suggest, originally referred to packaging or displays associated with a manufacturer's goods. The principle has been extended to include a confusing similarity in the appearance of the goods themselves, if this appearance is non-functional and is capable of serving as a trademark—as an indication of the source of the goods. *See, e.g., Service Ideas, Inc. v. Traex Corp.*, 846 F.2d 1118 [6 USPQ2d 1937] (7th Cir.1988) (distinctive external appearance of insulated beverage server): *Vaughan Mfg. Co. v. Brikam International, Inc.* 814 F.2d 346 [1 USPQ2D 2067] (7th Cir.1987) (design, materials and color of folding picnic table).
*See also* J. THOMAS MCCARTHY, 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION [hereinafter McCARTHY ON TRADEMARKS] § 8.01[3] at 8–8 (3d ed. 1994) (and cases cited therein) ("While "trade dress" traditionally referred to packaging and labelling of a product, the term has now been stretched to include the shape and design of the product itself.").

In order to prevail on its trade dress infringement claims, Celex must prove that "(1) its trade dress is protectible; and (2) its trade dress was infringed." *Badger Meter,* 13 F.3d at 1151; *see also Rock–A–Bye Baby, Inc. v. Dex Prods., Inc.,* 867 F.Supp. 703, 706 (N.D.Ill.1994). Trade dress is protectible if it is inherently distinctive or if it has acquired distinctiveness through secondary meaning. *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2758; *Badger Meter,* 13 F.3d at 1151. Additionally, the infringed trade dress must be nonfunctional.[52] *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2758. "Secondary meaning" exists where there is " 'a mental association in buyers' minds between the alleged mark and a single source of the product.' " *Echo Travel, Inc. v. Travel Assocs., Inc.,* 870 F.2d 1264, 1266 (7th Cir.1989) (quoting McCarthy on Trademarks § 15:2 at 659 (2d ed. 1984)). It is not necessary that the public be aware of the name of the source. *Id.* Secondary meaning may be established by showing that " 'the public is aware that the product comes from a single, though anonymous source.' " *Id.* at 1267 (quoting *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366, 380 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976)).[53] Finally, a finding of infringe-

ment requires a showing that the defendant's trade dress is sufficiently similar to that of the plaintiff's so as to create a likelihood of confusion on the part of consumers as to the source of the product. *Id.; Badger Meter,* 13 F.3d at 1151.[54]

Having thoroughly reviewed Celex's motion for preliminary injunction and all pleadings and exhibits submitted in connection with that motion, the Court has determined that an evidentiary hearing should be conducted to receive additional evidence bearing on several disputed issues in this case. This hearing will be consolidated with the parties' trial on the merits pursuant to Fed.R.Civ.P. 65.

The Court particularly wishes to receive additional evidence relating to (1) whether the trade dress of the products at issue is inherently distinctive or has acquired distinctiveness through secondary meaning; (2) whether the trade dress is functional; and (3) Celex's advertising practices with respect to its motivational products. In connection with the first issue, the Court notes that although Celex maintains that inspection of its product lines reveals their inherent distinctiveness, Pl.'s Mem.Supp.Mot.Prelim.Inj. at 8–10, the testimony of Celex's own Creative Director, Michael McKee, raises some question as to

---

52. Functionality is an affirmative defense on which the defendant bears the burden of proof. *Computer Care v. Service Sys. Enters., Inc.,* 982 F.2d 1063 (7th Cir.1992). Noting that " 'functional' means not simply that the feature serves a function, but that the feature is necessary to afford a competitor the means to compete effectively," *Schwinn Bicycle Co. v. Ross Bicycle, Inc.,* 870 F.2d 1176, 1188 (7th Cir.1989), the Seventh Circuit has defined a "functional" feature as "one which competitors would have to spend money not to copy but to design around.... It is something costly to do without ... rather than costly to have...." *Id.* Ornamental, fanciful, or decorative features, in contrast to features that are "somehow intrinsic to the entire product consisting of this manufacturer's brands and his rivals' brands," are generally not regarded as functional. *Id.; see also Computer Care,* 982 F.2d at 1071.

53. In considering whether a mark has acquired secondary meaning, courts generally consider the following factors:

*Direct Evidence*
(a) direct consumer testimony
(b) consumer surveys
*Circumstantial Evidence*

(c) exclusivity, length, and manner of use
(d) amount and manner of advertising
(e) amount of sales and number of customers
(f) established place in the market
(g) proof of intentional copying.
*Echo Travel,* 870 F.2d at 1267; *see also Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 393 (7th Cir.1992).

54. As set out in *AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611 (7th Cir.1993), the Seventh Circuit considers the following seven factors when evaluating likelihood of confusion:

(1) similarity between the marks in appearance and suggestion;
(2) similarity of the products;
(3) area and manner of concurrent use;
(4) degree of care likely to be exercised by consumers;
(5) strength of complainant's mark;
(6) actual confusion; and
(7) intent of defendant to palm-off his product as that of another.
*Id.* at 615 (internal quotes omitted). No single factor alone is dispositive; the weight accorded to each factor will vary from case to case. *Smith Fiberglass Prods., Inc. v. Ameron, Inc.,* 7 F.3d 1327, 1329 (7th Cir.1993).

the distinctiveness of at least two of the subject lines.[55] Both parties should be prepared to present evidence—in the form of expert testimony and exemplars if necessary—on the distinctiveness issue. With respect to the issue of secondary meaning, the parties should include in their respective evidentiary showings detailed and specific evidence[56] bearing on each of the types of circumstantial evidence identified in footnote 53 *supra*. With respect to the issue of functionality, the parties should be prepared to present evidence—again, in the form of expert testimony and exemplars if necessary—as to whether the subject trade dress is "somehow intrinsic to the entire product."

With respect to Celex's advertising practices, both parties should be prepared to present evidence on whether Celex contributed to any confusion in the market by virtue of its practice of permitting third-parties to advertise its products without attribution as to source. Finally, Executive Gallery should be prepared to present evidence on its claims of misappropriation hearing.

The parties will not be limited to addressing only the aforementioned issues during the evidentiary hearing; other issues that either party feels is in need of further development or clarification may be presented.

### *CONCLUSION*

Plaintiffs/counterclaim-defendants Celex Group, Inc. and Celebrating Excellence, Inc.'s motion to dismiss, or alternatively, for summary judgment is granted in part and denied in part. Summary judgment is granted in favor of Celex Group, Inc. and Celebrating Excellence, Inc. on defendant/counterclaim-plaintiff Executive Gallery's tortious

interference with prospective business advantage counterclaim. The motion is denied with respect to Executive Gallery's counterclaim for statutory fraud. Plaintiffs Celex Group, Inc. and Celebrating Excellence, Inc.'s motion for summary judgment on counts IX, X, and XI is granted in part. Partial summary judgment in favor of Celex on Counts IX, X, and XI in the amount of $343,544.46 is granted. Celex's motion for preliminary injunction is continued pending an evidentiary hearing which will be consolidated with a trial on the merits pursuant to Fed.R.Civ.P. 65. A status hearing in this case is set for February 7, 1995 at 10:30 a.m. for the express purpose of setting a firm date for the evidentiary hearing.

---

**55.** The following testimony is illustrative:

Q. In other words, based on your experience, brass-on-walnut plaques or awards are common offering of trophy shops and custom shops.

MR. KLUCHIN: Object to form.

A. I would say that that's, in my opinion—in my view, that would be correct.

McKee Dep. at 84–85.

Q. Do you view your Celex gold-on-blue cards as distinctive outside the catalog?

A. That I can't say. I don't think so.

McKee Dep. at 154.

**56.** The Court notes in this regard that much of the evidence in the record regarding amount and

manner of advertising, sales, and place in the market is relatively nonspecific, with no attempt to distinguish the evidence pertaining to the various product lines. The Court wishes to emphasize that Celex must particularize its evidence with respect to each of the product lines at issue in this case.

Additionally, although the present record is not completely clear, it suggests that there is at least one other manufacturer of related motivational products, the G. Neil Companies. The parties should be prepared to present evidence—if available—on the marketshare they and others, such as G. Neil Companies, hold in the relevant markets.